MATTIE LEE BROWN CALDWELL AND FRANK BOMAR, CLAIMANTS, APPELLANTS, v. J. A. KREIS & SONS, EMPLOYER, AND HARTFORD ACCIDENT & INDEMNITY COMPANY, INSURER, RESPONDENTS.—50 S. W. (2d) 725.

St. Louis Court of Appeals. Opinion filed June 7, 1932.

*Simon Fisher* and *Robert L. Aronson* for appellant.

*Holland, Lashly & Donnell* for respondents.

BECKER, J.—On May 27, 1929, John Brown, while working for the J. A. Kreis & Sons as a laborer under the name of Clyde Caldwell, sustained an injury from which he died. In due course Mattie Lee Brown Caldwell, as his widow, and thereafter Frank Bomar, father of the deceased, filed claims for compensation before the Missouri Workmen's Compensation Commission. The claims were heard together first before a referee; and on review by the full Commission resulted in the denying of compensation to either claimant. Herein we are considering solely the appeal of the claimant widow.

It was stipulated that Caldwell was employed by the employer and that on May 27, 1929, he suffered an accidental injury arising out of and in the course of his employment, and that he later died as a result of such injury. After a hearing the referee made a finding that the deceased was not legally liable for the support of his wife at the time he met with his injury which resulted in his death, and further that the deceased was not contributing to the support of his wife at the said time, and therefore that she was not a dependent. Upon a review by the Commission a final award was entered affirming said award of the referee.

Under our Workmen's Compensation Act, section 3319(d), Revised Statutes of Missouri 1929, it is provided that a wife shall be conclusively presumed to be totally dependent for support upon a husband legally liable for her support, and here on appeal the sole question for review is whether there is sufficient competent evidence in the record to support the ruling of the Commission that the deceased, John Brown, was not legally liable for the support of his wife, Mattie Lee Brown Caldwell, at the time he met with his injury which resulted in his death.

The award of the referee, which was adopted by the full Commission, on the question in point, finds that "the deceased left his wife, Mattie Brown, the latter part of 1925, and went to Jacksonville, Florida. It is true that there is no evidence in the record that the deceased left his wife because of her misconduct, but the record indicates the deceased went to Jacksonville, Florida, to work, and that during the time he was living in Jacksonville he requested that his wife come and live with him, which she refused to do."

"It is the husband's right to choose and establish the matrimonial domicile, . . . and on change of domicile by the husband it is the duty of the wife to follow him to the new domicile." . . .

". . . It is well settled that where a wife lives apart from her husband, with his consent, she cannot be said to have abandoned him and he is bound to support her and will remain bound until she refuses to return upon his request. . . ."

". . . The mere fact that the claimant, Mattie Lee Brown Caldwell, was the widow of the deceased, Clyde Caldwell, is not sufficient to conclusively show that he was legally liable for her

124

support. [See Beecham v. Motor Co., 225 Mo. App. 801, 38 S. W. (2d) 535.]''

''In the case at bar it appears that the deceased employee left Birmingham, Alabama, with a labor gang and went to Jacksonville, Florida, where he worked; that while the deceased was living in Jacksonville, Florida, he requested that his wife come and live with him, which she refused to do. The records do not indicate why she refused to live with her husband.''

''The referee therefore finds that the deceased was not legally liable for the support of his wife, Mattie Brown, at the time of his injury, . . . and she is not a dependent. . . .''

We have examined the record and are constrained to the view, and so hold, that there is not sufficient competent evidence in the record to support the finding of facts outlined above. In arriving at this conclusion we have in mind that on appeal, in the absence of fraud, the finding of facts made by the Commission within its powers is conclusive and binding and that such finding of facts and award of the Commission have the force and effect of the verdict of a jury. [Leilich v. Motor Co., 328 Mo. 112, 40 S. W. (2d) 601; Jones v. Coal Co. (Mo. App.), 46 S. W. (2d) 196; Rolens v. Constr. Co. (Mo. App.), 24 S. W. (2d) 1077; Kinder v. Hannibal Car Wheel & Fdry. Co. (Mo. App.), 18 S. W. (2d) 91.]

Furthermore, in determining whether or not an award made by the Commission is justified by the evidence on appeal, we consider only the evidence most favorable in support of such verdict, together with all reasonable inferences which may be drawn therefrom to support the conclusion of the Commission, and will disregard any unfavorable testimony where it is contradicted by the evidence supporting the conclusion of the Commission. [Leilich v. Motor Co., supra; Jones v. Coal Co., supra; Schulte v. Tea & Coffee Co. (Mo. App.), 43 S. W. (2d) 832.]

The claimant widow was the sole witness who testified as to her marital relationship with the deceased employee; their separation, and the causes therefor. According to her uncontradicted testimony she was married to the deceased under the name of John Brown on March 10, 1924, at Birmingham, Alabama. They lived together as husband and wife ''off and on for nearly a year. When we separated in 1925, he went to Jacksonville, Florida. It was along the last of 1925 when he went to Jacksonville. *When he left we had already separated.*''

''Q. Did he leave you, or did you leave him? A. He left me. . . . He came back to Birmingham in September, 1926; then he left my place again in November, 1926. . . . I have not seen him since. . . .''

''In 1925, whene he went to Jacksonville, he asked me if I wanted to live in Jacksonville, and I told him no.''

She further testified that she did her best while she lived with him, was true to him, treated him with kindness and affection, and acted as a good wife should.

"Q. Now, what was the reason for your separating? Was it your fault that you separated or was it that he just left? A. We could not get along somehow. We would always be confused."

"Q. Did you give him any cause to go ahead and leave you and not return? A. No, sir."

.  .  .  .  .  .

"Q. What was the occasion of him leaving you? A. I don't know."

"Q. In November, 1926, when he left you, did he tell you he was leaving? A. *We were already separated,* but he came to see me just the same. We were separated in 1925. When he came back we did not live together at all; he just visited me."

Claimant, in answer to a question by the referee, stated that her husband left her in November, 1926.

"Q. Now, did he at any time ask you to come and live with him? A. He did."

"Q. When was that? A. In 1926."

"Q. Was that after he had left you? A. Yes, sir.  .  .  . He asked me if I wanted to live in Florida."

"Q. Did he ask you to come down and live with him? A. Yes, in the letter."

"Q. What was the reason you didn't go? A. We were separated."

"Q. Is that the only reason? A. Yes."

Claimant further testified that she had received three letters from her husband from Gray Summit, in each of which he asked how she was getting along and if she ever thought of taking him back.

"Q. Did he ask you to come and live with him? What did he mean by wanting you to take him back? A. He knew he had left me and left me without a cause and quite naturally after he got away and got to thinking about me, he wanted to come back."

"Q. Why did he write that in a letter about taking him back? A. He would always ask me did I ever think of him and if he came home would I take him back again."

.  .  .  .  .  .

"Q. Did you give him any cause for leaving you—did you do anything that would cause him to leave you? A. No, sir."

"Q. What did he do; how did he act right before he left you? A. He would always run around with a bunch of boys at Birmingham and they would trifle like and would go to parties and stay out late at night and he would always tell me that I was really too good for him."

"Q. Now, if he had led an upright life and had not gone to those parties, etc., and not this trifling, would you have wanted to stay with him? A. Yes."

On further examination by the referee she was asked:

"Q. What was the reason you didn't go back and live with him? A. Because he wasn't in the same town I was and he said he wouldn't ever live in Birmingham again and I wanted to live in Birmingham."

"Q. Was that the only reason you didn't go live with him? A. He had mistreated me one time and I thought he would do it again."

There is further testimony that the deceased lived with his father and other members of his family until 1923. After leaving home the deceased lived at various places. There is no controversy but that in the course of his moving about he married claimant, Mattie Lee Brown Caldwell, in Birmingham, Alabama, in March, 1924, and separated from her the latter part of 1925, and that after this separation from his wife and prior to the time that he had gone to Gray Summit, where he worked for the defendant company and met with injury that caused his death, he had lived at Memphis, Tennessee.

Frank Bomar, another claimant for compensation for the death of the employee, Clyde Caldwell, testified that he was the father of the deceased; that the name of the deceased was Henderson Bomar; that Henderson left home in 1923, having gotten into trouble with a family in the neighborhood, and thereafter changed his name to Clyde Caldwell; that Caldwell was the surname of a half brother of the witness. He also testified that his said son had for a period of time lived in Memphis, and that he had learned that while his son was in Memphis he was living with a woman named Elsie Caldwell, "I didn't know whether she was his wife or not." On cross-examination he testified: "I never heard anything from Elsie in Memphis. I believe Reverend Dixon got in touch with her."

In light of this testimony we are unable to rule there is sufficient competent testimony to be found therein to support a finding that the husband, by reason of the facts attending the separation from his wife, was relieved of his legal liability to support her.

Whether or not the deceased was legally liable for the support of his wife at the time he met with his injury is not dependent upon whether or not the wife could, upon the facts, maintain an action for maintenance under the provisions of section 2989, Revised Statutes of Missouri 1929. Nor can claimant widow be held to have waived her right to support, as such right does not depend upon contract but is provided by law as a matter of public safety. And this is true even though the wife makes no demand for support. [30 Corpus Juris, 513. 13 R. C. L. 1188; Cotter v. Coal Co., 222 Mo. App. 1138, 14 S. W. (2d) 660.] Furthermore the widow testified that in 1928 he had sent her seven dollars, and in 1929, while he was working at Gray Summit, he had sent her money three or four times.

In light of the uncontradicted testimony to the effect that her husband had always "run around with a group of boys, would trifle," "go to parties without his wife, stay out late at night, and had mistreated his wife so that she was unwilling to return to him for fear that he would mistreat her again, it cannot be viewed as offering any support for a finding that the separation between claimant and her husband was by mutual consent and without fault on the part of the husband. Nor can that testimony be viewed as supporting a finding that the "records do not indicate why she refused to live with her husband."

Finding no substantial competent evidence in the record to support the award of the Commission denying claimant compensation on the ground that the employee husband was not legally liable for the support of the wife (claimant) at the time the employee met with his accident that resulted in his death, it follows that the judgment of the circuit court affirming the award of the Commission should be reversed and the cause remanded with directions to enter a judgment reversing the award and remanding the cause to said Commission. *Haid, P. J.,* and *Nipper, J.,* concur.