Mrs. Ruth Sena Leilich, Dependent of Charles L. Leilich, v. Chevrolet Motor Company, Appellant.—40 S. W. (2d) 601.

Division One, June 24, 1931.

*McCarthy, Morris & Zachritz* for appellant.

114

*George B. Whissell* and *William F. Coyle* for respondent.

116

RAGLAND, J.—This case comes to the writer on reassignment. It is an appeal by an employer from a judgment of the Circuit Court of the City of St. Louis affirming an award by the Workmen's Compensation Commission to the dependent of a deceased employee. The respondent in her brief fairly outlines the facts as follows:

"In January, 1928, Charles L. Leilich was a young man employed by the Chevrolet Motor Company, a corporation, located at St. Louis, Missouri, in the capacity of traveling sales representative for the Chevrolet Motor Company, being specifically assigned to the territory west and north of the Missouri River, west as far as Mexico, Missouri, and north of Louisiana, Paris and Perry, Missouri, including specifically the city of St. Charles, Missouri. He had been so employed about nine months, and was earning during all of this time $225 per month (admitted), or $2,700 per year. His method of working was to leave from home in a Chevrolet coach, owned by employer and furnished to him by employer for the purpose, and to call on the authorized Chevrolet dealers in his territory in an effort to push sales and assist them with the problems of selling and giving maintenance service. To assist him in this work his employer also furnished him with a portfolio and a number of books and instructions and with a motion picture outfit. He did not always carry along the motion picture outfit, but always carried the books along when working, and it is further testified that he only carried them and used them in his work. After his death they were claimed by employer, along with the Chevrolet car and kit of tire-changing tools and jack, and were returned to employer by deceased's brother. Unless close to St. Louis at the close of his work for the day deceased stopped at hotels along the route, but if close it was customary for him to come home for the night, at which times he was to keep and did keep the car in a garage which he rented in the rear of his home in St. Louis. About once a week he would drive to the Chevrolet Motor Company offices to make his weekly reports and at times to attend meetings for sales representatives.

"Prior to death deceased lived at his home, 5715a Dewey Avenue, St. Louis, Missouri, and there maintained and supported his family, consisting of a wife, the claimant, and two small daughters, all totally dependent on him.

"The accident, according to the undisputed testimony, happened in this wise:

"On Monday morning, January 16, 1928, some time prior to 8:30 A. M., deceased got up as usual to go to work, dressed in his 'regular sales clothes', intending that morning to call on a Chevrolet dealer in St. Charles, which call deceased had failed to make, according to schedule, on Saturday of the previous week, on account of roads to Paris and Perry being blocked by the weather. Dependent arose with him and prepared his breakfast, which he ate as usual. Then followed a few minutes of play with his infant daughters, after which he put on his coat, picked up his portfolio, kissed his family goodby and started down the back steps for the garage, promising his wife to be home that night for supper, saying he was only going to St. Charles and had to be back in St. Louis for a sales meeting the next

118

day. This was about 8:30 A. M. A little later he returned with his sleeves pushed up, saying he had a puncture and would have to change a tire. This flat tire was on the rear wheel on the right hand side of the car. The automobile carried a spare tire, and deceased told his wife he was going to replace the flat tire with it. To do this, he said he would change his clothes so as to keep his traveling suit clean for the sales meeting, as the car was, according to dependent's witness, very dirty. . . . Deceased changed his clothes and started back to the garage, about nine A. M., encountering his mother-in-law coming up the steps to help her daughter with the Monday washing. Deceased told his mother-in-law that he had started to work and had discovered a flat tire and had to change it. Deceased returned to the garage, his wife went to the basement to attend to the week's washing, and her mother remained upstairs to watch the children. About an hour later, or somewhere between 9:30 and ten A. M., his wife became worried about his not returning to change his clothes and went to the garage to see what was the matter. There she found her husband lying flat and at full length, unconscious, in the middle of the garage floor, alongside but not under the car, and with a tire-changing tool lying alongside of him on the floor. One wheel was jacked up, the bolts holding the flat tire and rim attached to that wheel were off, and were lying on the running board. The tool was described as one such as is used to remove these nuts for changing a tire. The engine was running and the garage filled with gas and smoke. The windows and door of the garage were all shut, and when the wife tried to open them they blew shut in the wind. She dragged her husband's body to the side door and laid his head on the door sill, to prop the door open and give him air, and shouted for help. Later, she put his head in her lap. Before going to the garage the wife had remarked to her mother about Charles being so long changing a tire. Two or three minutes later she was heard to shout, 'Mother, come quick!' The mother ran to the garage and found the wife sitting on the door sill with her husband's head on her lap, holding the door open against the wind. She turned the engine off as the wife did not know how to do it, and went for a doctor. Some nearby workmen were summoned and carried deceased to the alley, where he was attended to by Dr. Paule and Dr. Young.

"Dr. Paule testifies that he found deceased's body as far as visible (that is, the parts not covered by clothing) in a flushed, cherry red condition and, from this and other observations, pronounced the case one of carbon monoxide poisoning. Artificial respiration and heart and nerve stimulant injections were given, and finally city fireman came and used a pulmotor. All of this was of no avail, and after a conference of the doctors he was sent to the City Hospital where he was pronounced dead at one P. M. A coroner's inquest and post-mortem followed and deceased was buried."

There was evidence tending to show in addition to the foregoing that the appellant not only furnished deceased a car to be used by him in the transaction of its business, but paid all expenses incident to the operation and maintenance of the car; that it gave to deceased and other employees similarly engaged no express instructions, one way or the other as to changing a tire; that it was the custom of deceased and other employees, however, to change a tire, if a puncture occurred at the place where such service could not be conveniently obtained; and that the place nearest deceased's garage where he could reasonably have expected to procure the service of any one to take off the deflated tire and put on the spare one, was more than two miles distant.

Deceased had been repeatedly advised by his employer of the danger from carbon monoxide gas attendant upon the running of the motor of an automobile in a closed garage.

It was agreed at the hearing before the Commission that both employer and the deceased employee had accepted the provisions of the Act.

The Commission's findings of facts, so far as material to the controversy here, were as follows:

"1. Was there an accident? Yes. 2. Date: January 16, 1928. 3. Place: St. Louis, Missouri. 4. Was above employee in employ of above employer at time of accident? Yes. 5. Did accident arise out of and in the course of employment? Yes. 6. Before and at time of accident had employer elected to accept Act? Yes. 7. Employee? Yes. . . . 9. Work employee was doing for employer at time of accident? Salesman. 10. How accident happened: Overcome from carbon monoxide gas poisoning caused by automobile running in closed garage. 11. Did accident cause death? Yes."

Based on its findings the Commission made the following award:

"For medical aid the sum of $8. For burial expenses the sum of $150. For death benefits, to Ruth S. Leilich, widow, the sum of $20 per week for 517.5 weeks, or until prior death or remarriage, with remainder to Jean G. Leilich and Gladys V. Leilich, minors, share and share alike."

The findings and award were in all respects affirmed by the circuit court.

Appellant bases its contention that the judgment of the circuit court should be reversed on the following grounds: (1) The facts found by the Commission do not support the award; (2) there was no sufficient competent evidence in the record to warrant the finding (a) that there was an accident, and (b) that the alleged accident arose out of and in the course of the employment; (3) the death benefit awarded is grossly excessive.

I. Section 41 of the Workmen's Compensation Act (Sec. 3339, R. S. 1929) provides that "the award, together with a statement of the findings of fact, rulings of law, etc., shall be filed with the record of the proceedings" before the Commission. This provision evidently contemplates that the facts to be found and embodied in a statement shall be the ultimate constitutive facts upon which the award can be predicated as a conclusion of law. From such statement facts which are merely evidentiary in character should, therefore, be excluded. This is in accord with the general rule which has been consistently followed by this and the other appellate courts of the State with respect to an analogous provision of the Code. [Murdock & Dickson v. Finney, 21 Mo. 138, 140; Cochran v. Thomas, 131 Mo. 258, 268, 33 S. W. 6; Fahy v. Grocer Co., 57 Mo. App. 73, 75.]

The statement of the findings of fact in the case at bar is in the form of questions and answers. Reduced to narrative form it would read as follows: On January 16, 1928, Charles L. Leilich was in the employ of the Chevrolet Motor Company; he was employed as salesman; on said date the death of said employee was caused by an accident ("an unexpected or unforeseen event happening suddenly and violently . . . and producing at the time objective symptoms of an injury"); the accident happened while the employee was engaged in the work of salesman for his employer, and in this manner: he was overcome from carbon monoxide gas poisoning caused by an automobile running in a closed garage; the accident arose out of and in the course of the employment; before and at the time of the accident both employer and employee had elected to accept the Act.

That there was an accident, as defined by the Act, and that it arose out of and in the course of the employment were findings of fact, and not conclusions of law; they were ultimate facts, and, with the other constitutive facts found or admitted, afforded a sufficient basis under Section 3 of the Act (Sec. 3301, R. S. 1929) for an award of compensation.

II. Section 44 of the Act provides: "Upon appeal no additional evidence shall be heard and in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for re-hearing, or set aside the award upon any of the following grounds and no other: (1) That the commission acted without or in excess of its powers; (2) that the award was procured by fraud; (3) that the facts found by the commission do not support the award; (4) that there was not sufficient competent evidence in

the record to warrant the making of the award." From the foregoing it is clear that on this review of the Commission's findings of fact we are precluded from weighing the evidence; consequently questions of burden of proof and preponderance of the evidence require no consideration at our hands. The findings are in the nature of a special verdict, and as such are binding and conclusive, if supported by *any* substantial competent evidence. Whether they are so supported is one of the questions of law calling for decision on this record.

(a) The death of the employee was clearly the result of accident as defined in the Compensation Act, unless it was effected through conditions voluntarily brought about by Leilich himself for the purpose of self-destruction. [Jackson v. Investment Co., 22 S. W. (2d) 849; Manley v. Lumber Co., 221 N. W. 913; Cantor v. Elsmere Garage, 212 N. Y. Supp. 327.] That the evidence shows that his death was intentionally self-inflicted is the contention of the appellant. In this connection it asserts that there was strong circumstantial evidence of suicide which it summarizes as follows: "The evidence disclosed that deceased was a total loss as a salesman and was facing discharge. He was also an inveterate gambler. He knew all about the possibilities of carbon monoxide poisoning. He had not sent in any report of future activities to his employer. Had he really changed the alleged tire he could not have reached the territory until noon. The character of his clothing, the position of his body under the exhaust pipe. The funeral oration preached over him by his uncle."

The sum and substance of the showing that the employee was "facing discharge" was this: he had been a prize-winning salesman, but the sales in his territory during the last two or three months prior to his death had fallen off, and his immediate superior had told him that he would be given thirty days in which to bring about an improvement. The statement that deceased was an "inveterate" gambler is not warranted by the evidence; but more to the point, the evidence does not even tend to show that gambling had ever caused him the least embarrassment, financial or other. There was no competent evidence that his body was found under or near the exhaust pipe. The only person who knew where he was found was his wife, and she testified that he lay alongside the car. Whatever his uncle said in a funeral oration, as implying self-destruction, was pure conjecture, based on rumor and hearsay.

There is not a single fact or circumstance in evidence which points unmistakably to an intention on the part of Leilich to destroy himself, or from which no other inference than that of suicide can reasonably be drawn. The physical facts indubitably show that he was actually engaged in removing a deflated tire when overcome by

the gas. His starting the motor and permitting it to run while he was so engaged were entirely consistent with the preparations he was making to start on the trip to St. Charles. It was a January morning and he evidently wanted the engine warmed up and in running condition by the time he had effected a change of tires. The only risk of danger that he invited was permitting the doors of the garage to remain closed while he worked. And his doing so was attributable, all the facts and circumstances considered, to thoughtlessness—negligence—on his part rather than a purpose of destroying himself. If we were the triers of the fact and called upon to weigh the evidence, we would find accident, and not suicide.

(b) It is said that "out of" and "in the course of," as used in the Act, are not synonymous: that an accident may arise in the course of an employment and yet not arise out of it. This may be true, but it is difficult to conceive of an accident arising out of an employment and not in the course of it. But be that as it may, the only question with which we are confronted is whether the evidence was sufficient to warrant the finding that the accident "arose out of the employment."

Since the adoption of workmen's compensation acts, in England and then in this country, there have been many definitions of the phrase "arising out of . . . his employment" essayed by the courts. Some of these definitions, framed by eminent courts in view of the facts of the particular cases before them, have been repeated so often by other eminent courts that they have become formulae, to some one of which, it is thought, the facts of every case must conform in order for compensation to be allowable therein. [Wahlig v. Grocer Co., 325 Mo. 677, 29 S. W. (2d) 128; Cassidy v. Eternit, 32 S. W. (2d) 75; Jackson v. Investment Co., supra.] There is no justification for investing the words "arising out of . . . his employment" with a technical meaning: they are plain, ordinary and everyday words, and should therefore be given their plain, usual and ordinary meaning. Every case involving their application should be decided upon its own particular facts and circumstances and not by reference to some formula.

The proximate cause of Leilich's death was negligence,—in running the motor, or in failing to keep open the doors of the garage, while he changed tires. But whether or not the accident resulting in his death "arose out of and in the course of his employment" within the meaning of the compensation act is not to be determined by the common law rules of negligence. It is not necessary, therefore, that such accident should have been one reasonably to be anticipated as an incident of the employment. The only question is whether it did in fact arise out of and in the course of the employment.

"The obligation to pay compensation under the Workmen's Compensation Act . . . is absolute when the fact is established that the injury has arisen 'out of and in the course of' the employment. It is of no significance whether the precise physical harm was the natural and probable or the abnormal and inconceivable consequence of the employment. The single inquiry is whether in truth it did arise out of and in the course of that employment. If death ensues, it is immaterial whether that was the reasonable and likely consequence or not; the only question is whether in fact death 'results from the injury.' " [Sponatski's Case, 220 Mass. 526, 531.]

Leilich was not employed to change tires, but to sell automobiles. But clearly the changing of tires in the circumstances shown by the evidence was a task incident to his employment as salesman. Out of the performance of that task the accident arose which caused his death. This being obviously true, why split hairs in trying to trace a "causal connection" between his employment and his death.

There can be no question but that the employee in this case at the time of the happening of the accident which caused his death was engaged in, or about, premises where his services required his presence as a part of such services, within the meaning of Section 7 of the Act, now Section 3305, Revised Statutes 1929. [Wahlig v. Grocer Co., supra.]

 Appellant next insists that the total death benefit which can be awarded under the Act is $6,000, that is, $20 per week for 300 weeks. The same question was presented in Wahlig v. Grocer Co., supra. After a careful and painstaking consideration of the relevant provisions of the Act, it was ruled adversely to appellant's insistence here. Nothing can be added to what is there said in construing the provisions of Section 21 and those of other parts of the Act incorporated into it by reference; the construction reached is obviously sound. It follows that appellant's contention under this head must be overruled.

The judgment of the circuit court is affirmed. All concur.