BETTY JANE CRUTCHER, a Minor, by BILLIE BRUNER CRUTCHER, her Guardian, Appellant, v. CURTISS-ROBERTSON AIRPLANE MANUFACTURING COMPANY and LIBERTY MUTUAL INSURANCE COMPANY.

BETTY JANE CRUTCHER, a Minor, by BILLIE BRUNER CRUTCHER, her Guardian, v. CURTISS-ROBERTSON AIRPLANE MANUFACTURING COMPANY and LIBERTY MUTUAL INSURANCE COMPANY, Appellants.— 52 S. W. (2d) 1019.

Division One, September 3, 1932.

170

*Holland, Lashly & Donnell* for Betty Jane Crutcher.

*Woodward & Evans* for Curtiss-Robertson Airplane Manufacturing Company and Liberty Mutual Insurance Company.

ATWOOD, J.—This is a claim for compensation brought before the Missouri Workmen's Compensation Commission in behalf of the minor daughter of Sidney S. Crutcher, an employee of the Curtiss-Robertson Airplane Manufacturing Company, who was killed as the result of an airplane accident near the employer's assembly plant in St. Louis County, Missouri, on June 21, 1929.

Upon the claim and answer filed and evidence adduced the commission awarded death benefits to claimant in the sum of $20 per week for 378.2 weeks, and burial expenses in the sum of $150. The employer and insurer appealed from this award on two of the four grounds authorized by Section 44 of the act (Laws 1927, p. 513), namely, that the facts found by the commission do not support the award, and that there was not sufficient competent evidence in the record to warrant the making of the award. On appeal the circuit court held that there was sufficient competent evidence in the record to warrant the commision's finding that "Sidney S. Crutcher, deceased, on or about June 21, 1929, while in the employ of Curtiss-Robertson Airplane Manufacturing Company, sustained an accidental injury arising out of and in the course of his employment, resulting in his immediate death." However, the court set aside the award

and remanded the cause for a rehearing on the ground that the commission found and declared claimant a total dependent solely upon an erroneous declaration of law, and did not make its finding and award as to dependency upon any facts found by it, and the award therefore was not based upon sufficient competent evidence to warrant the same. The cause comes here on cross-appeals from the judgment entered in accordance with the court's holdings above indicated.

██ Appellants' first contention here is that "the accident which resulted in the death of claimant's father did not arise out of and in the course of the employment."

Section 3 of the Workmen's Compensation Act (Laws 1927, p. 492) provides: "If both employer and employee have elected to accept the provisions of this act, the employer shall be liable irrespective of negligence, to furnish compensation under the provisions of this act for personal injury or death of the employee *by accident arising out of and in the course of his employment,* and shall be released from all other liability therefor whatsoever, whether to the employee or any other persons." (Italics ours.)

Section 7 (c) of the same act (Laws 1927, p. 496) provides: "Without otherwise affecting either the meaning or interpretation of the abridged clause, 'personal injuries arising out of and in the course of such employment,' it is hereby declared not to cover workmen *except while engaged in, or about the premises where their duties are being performed, or where their services require their presence as a part of such services."* (Italics ours.)

In Wahlig v. Grocer Co., 325 Mo. 677, 683, 29 S. W. (2d) 128, 130, 131, we construed the above italicized words as follows:

"It has been quite uniformly held that an injury arises *'out of'* the employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury; and that an injury to an employee arises *'in the course of'* his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental thereto. [See Kiser on Workmen's Compensation Acts, Secs. 64 and 72 (40 Cyc., following p. 2880), and cases cited.] . . . By declaring in Section 7 (c) that injuries to employees arising *out of* and *in the course of* their employment, as provided for in Section 3, shall cover injuries to employees 'while engaged in, or about *the premises where* their duties are being performed, or *where* their services require their presence as a part of such services,' the Legislature, in our opinion, intended to extend the protection of the law to all employees while in or about *any premises where* they may be engaged in the performance of their duties, and while *at any*

174

*place where* their services, or any act, task or mission which forms a necessary part of their services, may reasonably require them to be.''

▮ We have also said in Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601, 605: ''There is no justification for investing the words 'arising out of . . . his employment' with a technical meaning; they are plain, ordinary, and everyday words, and should therefore be given their plain, usual and ordinary meaning. Every case involving their application should be decided upon its own particular facts and circumstances and not by reference to some formula.''

In the light of the foregoing statutory provisions and judicial interpretation we shall endeavor to ascertain from the record whether or not there was sufficient competent evidence before the commission to warrant its finding that the accident arose out of and in the course of the employment, bearing in mind that the commission's finding is binding and conclusive if supported by any substantial competent evidence and questions of burden of proof and preponderance of the evidence are out of the case on appeal. [Sec. 44 of the Act, Laws 1927, p. 512; Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601, 604.]

At the hearing before the commission it was stipulated and agreed that Sidney S. Crutcher was in the employment of the Curtiss-Robertson Airplane Manufacturing Company on or about June 21, 1929; that he and his employer were operating under the Compensation Act; that if there is any liability on the part of the employer it is fully covered by the insurer, the Liberty Mutual Insurance Company, in accordance with the Compensation Act; that the employer's weekly wages were $37.82; that the insurer has paid the dependent no compensation to date on account of the alleged injury; that June 21, 1929, be considered the date of the death of the employee; that $150 is a reasonable burial expense; and that said employee was killed in an airplane accident on June 21, 1929.

It appears from the evidence that the employer was, on June 21, 1929, and prior thereto, engaged in the airplane manufacturing business at its plant near Anglum, St. Louis County, Missouri, and that the employee was the chief inspector at the employer's plant.

The duties of the employee, as testified to by Mr. Damon, vice-president of the employer and the official of the employer from whom the employee received his instructions, were as follows:

''He was charged with the inspection of the parts; his duties were to safeguard the quality of the product of the factory; specifically, he employed and directed the activities of the inspectors, laid out their particular duties, allocated the work among them, supervised

their entire actions and applied himself personally at any particular place of operation which he felt might need it.

"He controlled the inspection department, hired and fired the inspectors of the department and supervised the quality of the product manufactured. He assisted the final assembly inspector and put an official o. k. on all the machines manufactured and signed the packing sheets for those machines, which is the last factory clearance. . . . He controlled the department ·and concentrated his personal attention anywhere that there was difficulty in the department, and put in such time as he had on the back end of the line, or front door, as it were to assist the final assembly inspector, which we consider the most important place in the inspection department.

"The chief inspector is responsible for the proper functioning of his entire department and charges himself with that responsibility."

Paul Ahlers, operations dispatcher of the employer, testified with respect to the duties of the employee as follows:

"Specifically, he was responsible for the quality of the products put out by the company. He had charge of inspecting the various departments, and he was naturally responsible for the men and directed their work. . . . His duties were the supervision of the department and of the work of the men there. He usually took it upon himself to o. k. the ships just before delivery, to see that everything was finished; that is the final assembly inspector's job."

As to Crutcher's duties at the moment before the plane in which he was killed was to be taken from the factory to the storage hangar, in which hangar the plane was to be stored overnight, and from which it was to be delivered to the customer the following morning, Mr. Ahlers testified:

"Q. And what else did Mr. Crutcher have in his hand in addition to the packing sheets? Were there certain other cards? A. Yes, the inspection cards, the cards which follow the various parts of the airplane down through the factory or assembly, and just prior to the ship leaving it is the duty of the final assembly inspector to see that everything is cleared up on them. When this is done he knows that the plane is all right for delivery, ready for delivery, see, and then he signs the packing sheets.

"Q. And he had some of those cards in his hand? A. Yes."

In the process of assembling and inspecting the finished product of the employer, numerous printed forms (inspection cards) were used to indicate the completion of the work. The final clearance papers were known as "packing sheets." These were the records used for delivery from the factory to the purchaser and contained the engine and factory serial numbers and such other information as was deemed of value as a record. There were four copies of

these sheets for each plane, one pink, one white and two yellow. It was Crutcher's duty to sign each of these packing sheets as evidence that the plane was completely inspected and was ready for delivery to the customer. After the packing sheets were signed Crutcher would either deliver them to the operations dispatcher or leave them in the ship. Usually they were left in the ship, between the cross wires on the wind shield.

On June 21, 1929, the date on which deceased met his death, the factory was working overtime in order to complete a plane, the delivery of which was promised for the following morning. Mr. Damon testified:

"We were quite rushed at that time and had worked overtime.

"Q. And it had been very urgent then that all the tests be made the evening before this particular time, so that the plane would be ready for delivery on the following morning? A. Yes."

The usual closing time at the factory was 4:30 P. M., and the accident in which the employee met his death occurred after five P. M. The factory of the employer was located at a considerable distance from the storage hangar of the employer, the distance being estimated by Mr. Damon and by Mr. Lazier, deputy sheriff of St. Louis County, as about one mile. It was the custom at the factory to take the finished plane from the factory to the storage hangar for storage after its completion. On the evening in question the testimony shows that some time after five P. M. the airplane, which was to be delivered to a customer on the following morning, was stationed in front of the factory, with the motor running and the propeller going. This plane had been "test flown" the day before and certain changes were made on it after its test flight, to-wit, the installation of a new style magneto and also oversized wheels.

Just a few minutes before the accident Mr. Ahlers, operations dispatcher of the employer, came out of the factory and walked in the direction of the plane and observed Crutcher sitting in the rear seat of the plane looking over the inspection cards, and signing the packing sheets. Mr. Ahlers gave as the reason for Crutcher's getting into the plane to sign the packing sheets that the wind created by the propeller was so strong he could not sign them in the open around the plane. Just then Alfred Dunlap, employer's test pilot, whose duty it was to take the plane from the factory to the storage hangar, entered the plane and "reved up" (increased the revolutions per minute) the motor, then slowed it down and turned toward Crutcher, who said to Dunlap: "What are you going to do?" Dunlap testified on direct examination that he is not sure whether he replied that he was going "to fly" the plane over to the storage hangar or "take" it over to the storage hangar, but on cross-examination by counsel for the employer and insurer he testified:

"Q. What did you say? A. I said, 'I am going to take it over to the Curtiss-Robertson storage hangar.'"

Thereupon Crutcher said, "Well, I am going along." The blocks in front of the wheels of the plane, which prevented it from going forward while the motor was running, were then pulled and the plane ascended into the air to the height of about 200 feet, when it side-slipped and crashed, resulting in injuries to Crutcher from which he shortly thereafter died. Dunlap estimates that it was a minute and a half to two minutes from the time he "reved up" the motor until the plane started up.

The packing sheets, covered with blood, were found in the plane after the accident. On three of the sheets appear the following: "S. S. Crutcher 6/21/29," and on the fourth packing sheet appears only the following: "S. S. Crutch."

Mr. Damon testified that it was the usual practice for the test pilot (whose duty it was to test the planes and take them from the factory to the storage hangar) to taxi them from the factory to the storage hangar rather than to fly them over. Mr. Ahlers testified that if the field was muddy the plane would usually be flown to the hangar, but in settled weather it would usually be taxied—it was up to the test pilot to decide; that on the evening of June 21, 1929, the field was in good condition; that, so far as the field goes, there was no special reason for flying; that, so far as the condition of the field and the weather were concerned, in taking the plane to the storage hangar the usual thing would have been to taxi it down.

Mr. Damon testified as follows with reference to Crutcher's riding in the plane when it was taxied from the factory to the storage hangar:

"Q. Did you have any serious objection to him riding in the plane when it was taxied over to the hangar? A. No, sir.

"Q. They were permitted to do that? A. Yes.

"Q. Had they been in the habit of riding over there to the hangar when the ship was taxied over? A. I should say they had not; there was no reason for a man going over there unless there was something special."

Mr. Damon further testified that on some occasions Crutcher's duties required him to go into the air along with the pilot. He could recall only one particular occasion when Crutcher, at Damon's request, went up in a plane to make cooling tests on radiators. Mr. Damon also testified that Crutcher did not have any duties which would normally, in the ordinary activities of the plant, cause him to go into the air or into an airplane for the purpose of taking a flight, absent orders from him, and that on the date of Crutcher's death he did not authorize him, directly or indirectly to go into the

air on a flight, and that no employee other than the test pilot could fly or ride on a flight without specific authorization.

Crutcher's automobile, which he used in going to and from his work, was, on the day of his death, parked in front of the employer's factory, which was approximately a mile from the storage hangar, and was removed from there a few days later by a deputy sheriff of St. Louis County.

■ ■ In the commission's "Statement of Facts and Rulings of Law" the following sentence appears:

"There is no proof in the record that the presence of deceased in the airplane at the time of the accident was for anything but business purposes; it was after the regular quitting time; the delivery of the airplane was promised the customer the following morning; one packing sheet remained completely unexecuted, and the only reasonable inference that can be made is that the deceased was at a place where his duties required his presence and that he was engaged in duties in the interest of his master."

Quoting only the first clause of the above sentence counsel for appellants say that "the award is not based upon an affirmative finding that the accident arose out of and in the course of the employment, but upon a negative finding that there is no evidence to the contrary." The criticism is obviously without merit in the light of the entire sentence and its context, and such would be the case even if the clause stood alone. Section 41 of the Workmen's Compensation Act requires that the award "together with a statement of the findings of fact, rulings of law and any other matters pertinent to the question at issue, shall be filed with the record of proceedings," etc. The record shows the commission's "Findings of Fact" in the form of questions and answers, wherein among other things appears the commission's finding of the ultimate fact that the accident arose "out of and in the course of the employment." Obviously the only question before us on this aspect of the case is whether the record shows that this finding is supported by any substantial competent evidence, and in pursuing this inquiry we regard the evidentiary facts themselves rather than the commission's recitals and comments pertaining thereto.

Reviewing the evidence as we must in the light most favorable to the commission's finding that the accident arose out of and in the course of the employment (Metting v. Lehr Const. Co., 32 S. W. (2d) 121, 123, and cases cited; Caldwell et al. v. J. A. Kreis & Sons, 50 S. W. (2d) 725, 726; State ex rel. Buttiger v. Haid, 330 Mo. 1030, 51 S. W. (2d) 1008, it seems clear that when Crutcher seated himself in the plane and began to check over the inspection cards and sign the packing sheets he was engaged in or about the premises

where his duties were being performed and where his services required his presence as a part of such services, as provided in Section 7 (c) of the act. Counsel for appellants suggest that he might have performed the clerical part of this work in the office or some other place. There was abundant evidence, however, that the force was working overtime to prepare this plane for delivery the following morning. Mr. Damon testified that Mr. Crutcher's duties required him to make an inspection of the plane after it was test flown "to make sure that nothing had worked loose, or any difficulty had developed. . . . He must look at the card and ascertain that all the instruments and controls and other parts of the machine are properly functioning before he has authorization to sign the packing sheets.'' Furthermore, Crutcher's own inspection of the plane was necessary to test the accuracy of the inspection cards and his effort to perform the clerical features connected therewith at the time and place that would cause the least delay was well within the scope of his employment and in the interest of his employer.

But counsel point to testimony of witness Ahlers that when the chief inspector signs the packing sheets ''it should indicate that his duties are entirely completed,'' and to testimony of witness Damon to the effect that Mr. Crutcher did not have any duties which would, normally, in the ordinary activities of the plant, cause him to go into the air or into an airplane for the purpose of taking a flight, absent any orders from him, and that final inspection had been made, including the test flight. From such testimony counsel argue that in remaining in the plane after the pilot signified his intention to take it to the hangar Crutcher was acting ''outside of the duties for which he was employed.''

The above course of reasoning leaves out of account a number of substantial competent evidentiary facts which the record shows were before the commission. It appears that Crutcher was killed before he had even finished signing all copies of the packing sheet, and according to the evidence his responsibilities and control of the plane would not cease until he had fully signed all copies of this sheet and delivered them to the operations dispatcher, whose duty it was to deliver the plane to the customer. The fact that he did not require the pilot to hold the plane there, as he had authority to do, until he had signed and delivered all of these sheets to the operations dispatcher, who was standing nearby, clearly indicates that it was not his intention to surrender control of the plane at that time. We think it is of little consequence whether he understood that the plane was about to be taxied or about to be flown to the hangar. In either case he elected to go with it, and it matters not that he might have been negligent or disobedient if performance of

the services for which he was employed reasonably required that he do so as a part of such services. And there was substantial evidence that such might have been the case because Mr. Damon, when asked whether a plane is ever transferred from the factory to the storage hangar until it has been completely inspected, replied: "Not generally; it might have occurred. There is a shop order against it, but when working under rather crowded conditions it might have happened." He also testified as follows:

"Q. Could the inspector, under your method of manufacture have anything to do with the plane after signing the packing sheets? A. No, sir; not unless something wrong was called to his attention.

"Q. In other words, if they broke something on the way from the factory to the storage hangar then it would be that he would be called upon to look it over again? A. Yes."

Mr. Ahlers also testified that Crutcher "usually took it upon himself to o. k. the ships just before delivery, to see that everything was finished." Mention has already been made of the fact that after the test flight additional equipment consisting of large wheels and a scintilla magneto was ordered installed, inspection of the actual operation of which was within the range of Crutcher's duties. Should damage occur to these or any other parts or should any imperfections develop in their operation before the plane was safely stored in the hangar prompt delivery to the customer as planned would hardly be possible without the actual presence and supervision of the chief inspector. We think that there was substantial competent evidence to support the commission's finding that the accident arose out of and in the course of the employment.

The only other point urged by appellants is that the commission's award was properly set aside because, (a) the commission's finding of total dependency "was based solely upon the erroneous and illegal assumption that claimant was conclusively presumed to be a total dependent by virtue of Section 21 (d) of the Workmen's Compensation Act (R. S. 1929, sec. 3319), whereas no such presumption existed in this case, inasmuch as claimant was not living with the parent at the time of the latter's death;" and (b) "there is not sufficient competent evidence in the record to support the award of total dependency."

On the question of dependency the evidence showed that claimant was about two years of age at the time of her father's death and had always lived with her mother at Louisville, Kentucky. The parents had separated prior to her birth and about one year before the accident the mother had obtained a divorce, the decree therein giving her the care and custody of the child. Another provision of the decree required the father to pay $5 per week for the sup-

port of the minor daughter, and recited that the mother "hereby agrees that such payments shall be in full for the maintenance and support of the infant child, Betty Jane Crutcher." It appears from the evidence that he had been performing this obligation up to the time of his death. In addition, he had occasionally sent small sums to the mother which were used to purchase additional clothing for the daughter and anything that she needed. At the time of the father's death, and for about a year prior thereto, the mother was earning about $90 a month as a stenographer in a real estate office at Louisville. It also appears from the record that the claim for compensation filed by claimant with the commission contained a statement (25) that the extent of dependency of the dependent, Betty Jane Crutcher, was total. The employer and insurer filed answer to this claim in which the following appears:

"7. All of the statements in the claim for compensation are admitted except the following (here should be separately set forth the question number of each disputed statement in the claim for compensation, the reason why disputed and the facts in regard thereto. Also any other facts tending to defeat the claim. Unless the facts stated clearly and fully show to the contrary, the disputed statement will be taken as true): 15. It is specifically denied that the deceased was acting within the scope of his employment at the time and that the accident arose out of or in the course of his employment."

In fact, nowhere in this answer was claimant's statement that she was a total dependent ever challenged or disputed. From all of the foregoing it seems clear that there was sufficient competent evidence to support the commission's finding of total dependency. We have carefully read all of the decisions cited by counsel for appellants in this connection and find the cases easily distinguishable from this case either on account of the statutes construed or the records reviewed.

In the commission's "Findings of Fact" the claimant, Betty Jane Crutcher, is named as the only dependent of the deceased; the deceased is stated to have been in the employ of appellant at the time of the accident; the accident is stated to have arisen out of and in the course of the employment; *and the extent of claimant's dependency is stated to be total.* In the commission's "Statement of Facts and Rulings of Law" the following appears with reference to claimant's dependency:

"That the deceased left surviving a daughter, Betty Jane Crutcher, under the age of eighteen at the time of the injury; the wife, having secured a divorce prior to his injury, was not a dependent at the time of the injury. Minor children under the age of eighteen are

conclusively presumed to be total dependents (Section 21, Paragraph d (2), Workmen's Compensation Act, Laws of 1927)."

■ While the section cited in support of the above ruling of law is without application to the facts shown in this case we do not think that the commission's award should be set aside on that account. Among the commission's findings of fact was one that claimant was a total dependent. We have just held that this finding was supported by substantial competent evidence before the commission, and it warrants the award made. To hold that it should be set aside merely because of such misapplication of law not affecting the result, or because in its "Statement of Facts and Rulings of Law" the commission omitted to recite its previous finding of total dependency, would be violative of Section.76 of the act (Laws 1927, p. 522) which requires that all of the provisions of the act "shall be liberally construed with a view to the public welfare and a substantial compliance therewith shall be sufficient to give effect to rules, regulations, requirements, awards, orders or decisions of the commission, and they shall not be declared inoperative, illegal or void for any omission of a technical nature in respect thereto."

For the reasons above stated the judgment of the circuit court is reversed and the cause is remanded with instructions to set aside its judgment heretofore entered therein and enter a judgment affirming the commission's award. All concur.