JAMES HUNT AND ANNA BELLE HUNT, DEPENDENTS OF JAMES CHARLES HUNT, DECEASED EMPLOYEE, APPELLANTS, V. JOHN L. JEFFRIES D/B/A MOUND CITY ERECTION COMPANY, EMPLOYER, AND LIBERTY MUTUAL INSURANCE COMPANY, INSURER, RESPONDENTS.—156 S. W. (2d) 23.

St. Louis Court of Appeals.   Opinion filed December 2, 1941.

*Bartley & Mayfield* for appellants.

*John F. Evans* for respondents.

McCULLEN, J.—This is an appeal from a judgment of the Circuit Court of the City of St. Louis, Missouri, which affirmed an award of the Missouri Workmen's Compensation Commission denying the claim for compensation of James Hunt and Anna Belle Hunt on account of the death of James Hunt, Jr.

Referee White of the Workmen's Compensation Commission, after a hearing, made an award to claimant James Hunt for funeral expenses and to James Hunt and Anna Belle Hunt jointly an award of compensation of $20 per week for 316.9 weeks. Upon a review by the full commission, two members thereof (the third member dissent-

ing), made a finding and award denying compensation, giving their reasons for such denial as follows:

"We find from all the evidence that the contract of employment between deceased employee herein and employer, John L. Jeffries, doing business as Mound City Erection Company, was made in the State of Illinois, and that the accident alleged herein and from which employee died happened in the State of Illinois. Therefore, this Commission is without jurisdiction in this claim and compensation is accordingly denied."

From said finding and award of no compensation claimants appealed to the circuit court where the finding and award were affirmed, and claimants thereafter duly appealed to this court.

Appellants contend that the circuit court erred in affirming the award of the commission denying compensation on the ground of lack of jurisdiction; and that the court further erred in not holding that the contract of employment involved herein was made in Missouri.

The record shows that it was admitted that the employer was a major employer and carried insurance in compliance with the provisions of the Missouri Workmen's Compensation Act. It was agreed by the parties that, if the Missouri Workmen's Compensation Act was applicable under the evidence, then both employer and employee were governed by the provisions of said act.

It was admitted that James Hunt, Jr., sustained an accident on May 17, 1939, while he was in the employ of the respondent employer, and that said accident arose out of and in the course of his employment; that death resulted to the employee on May 22, 1939, from said accident; that the accident occurred at Scott Field near the City of Belleville in the State of Illinois; that the employee had been working on the same job for the employer from March 14, 1939, to the date of the accident; that on said date some scaffolding on which he was working fell, causing the injuries which resulted in his death; that appellants' claim for compensation was filed herein within the time required by law. It is undisputed that for a long time prior to and during such employment, the employee lived with the claimants in their home in the City of St. Louis, Missouri; that claimant appellant James Hunt was the natural father of James Hunt, Jr., the employee, and that claimant appellant Anna Belle Hunt was his stepmother; that the employee was an apprentice ironworker by trade, and his father was a journeyman ironworker, an apprentice ironworker being one who is learning the trade.

John McCarthy, who was a witness for claimants, was the business agent for the Ironworkers' Union, Local No. 392 of and for East St. Louis, Illinois. McCarthy lived in East St. Louis, Illinois. Said local union did not have jurisdiction over the St. Louis, Missouri, territory, but did have jurisdiction over certain territory which included East St. Louis and Scott Field, Illinois, where the accident

occurred. It was a local union of the international union of iron-workers which was affiliated with the American Federation of Labor. During the months of March, April and May, 1939, the employer was engaged in doing some erection work at Scott Field, Illinois. Said employer was a member of a group of contractor employers who had entered into a written agreement with the District Council of the ironworkers' union which was located in the City of St. Louis, Missouri. The District Council included in its jurisdiction the "east side" territory involved herein, as well as the St. Louis territory. The agreement between said group of contractors, including the employer herein, on the one side and the District Council of the ironworkers' union on the other provided that the members of the contractors group would employ only members of the ironworkers union in structural steel work and certain other work. The terms and conditions of the employment of ironworkers with respect to hours and wages and conditions of employment were agreed upon and fixed in said agreement.

The regular custom under said agreement and the rules of the union was that all ironworkers were employed through the business agent of the local union and not by arrangements between individual contractors and the individual ironworkers or apprentices direct. If an employer wished to employ a particular union member, he would make such request of the business agent of the union who would try to arrange for such union member's service if he was available. All transactions with reference to obtaining ironworkers and ironworker apprentices on any job within the East St. Louis district, which included Scott Field, were made through McCarthy as business agent of the union.

The only testimony adduced at the hearing was that introduced by claimants. John McCarthy, business agent of the East St. Louis local union, testified that on March 13, 1939, he had a conversation with Mr. Watson who was the superintendent on the job at Scott Field, Illinois, for the respondent employer herein; that the conversation took place at Scott Field and that Mr. Watson asked the witness to get him two ironworker apprentices. The witness testified that at that time there was a good bit of work going on at Scott Field, and that he, as business agent, didn't have anyone out of work right then belonging to the East St. Louis local; that he told Watson that and told him that he, the witness would have to get the men from St. Louis; that Watson then said: "That's o. k. by me; just so you get them on the job tomorrow morning." The witnenss further testified that he knew James Hunt, Jr., and knew he was then out of work; that he called by telephone from his own home in East St. Louis, on the same day that he had talked with Watson, to the home of James Hunt, claimant herein, which was also the home of James Hunt, Jr. On that call McCarthy was informed that Hunt, Jr., was not at home at

the time, and McCarthy talked only to Hunt, Jr.'s father. In this connection witness McCarthy testified as follows:.

"Q. What did you do and what did you say then with reference to his going to work? A. I told Mr. Hunt, Senior, to tell James Hunt, Junior, to go to Scott Field and go to work for Jeffries in the morning.

"Q. Did you leave any further instructions as to what to do when he arrived there? A. Just to report for work; that they needed some men there.

"Q. Now, do you know—did you have any further conversation by telephone, or otherwise, with Mr. Hunt after that day? A. No, not that day.

"Q. Do you know whether Mr. Hunt, Junior, actually went to work the next day? A. He did.

"Q. How long did he continue on that job? A. Until the time of his injury along in May, I believe it was; May 17.

"Q. Did you leave any instructions there as to when Mr. James Hunt, Junior, was to go or who he was to see when he went over there? A. To report to Mr. Watson.

"Q. That was the only instruction you gave? A. Right."

Mr. Hunt, Jr., the employee, was not a member of the East St. Louis local of which McCarthy was the business agent. McCarthy testified that the custom and rule of the union with respect to obtaining apprentice ironworkers outside the jurisdiction of the East St. Louis local, in cases where he as the business agent of that local did not have any men available for work, were that upon the request to him by the contractors to get men at some other places he usually got in touch with St. Louis where there was also a local union of the ironworkers. McCarthy was the regular business agent for the East St. Louis local, but he was not business agent for the City of St. Louis local union of which Hunt, Jr., was a member.

The evidence is clear and undisputed that, at the time McCarthy talked over the telephone to Hunt, Sr., about Hunt, Jr., going to work in Illinois, McCarthy was calling from East St. Louis, Illinois, and Hunt, Sr., was talking from his home in the City of St. Louis, Missouri.

Appellant Hunt, Sr., testified, with respect to the conversation over the telephone on March 13, 1939, between McCarthy and himself, as follows:

"A. Well, I got a call about supper time. He asked if the boys were working. I told him one was working but that James was not, so he said could I send him over to Scott Field. I said yes, He said, have him to go over to Scott Field and report to this Mr. Watson, the Mound City. When the boy came in I told him that I had had a call from McCarthy for him to go over to Scott Field to go to work and

he said, 'I can ride with Whitey Reed,' so he was tickled about it and he went over there the next morning.

"Q. Now, Mr. Hunt, where were you when you told your boy, James Charles, about the telephone conversation you had? Where were you when you told him about that? A. Right in the kitchen.

"Q. At your home? A. Yes.

"Q. Where is that located? A. 2012 Rutger Street.

"Q. In the City of St. Louis, Missouri. A. Yes.

"Q. When you told him about that what did your boy say with reference to it? A. He said, 'All right, I'll be over there.' "

The evidence further showed that appellant Hunt, Sr., told his son, Hunt, Jr., the deceased, that he, Hunt, Jr., would have to go to Scott Field to make arrangements for a permit from McCarthy, the business agent for the East St. Louis local union; that Hunt, Jr., went over to Scott Field the following morning with the man whom he had referred to as "Whitey Reed." The evidence also showed that McCarthy, as business agent for the East St. Louis local union, issued a permit from that local union to Hunt, Jr., to go to work as a union member, which was the customary practice of the union in cases where members of another local union went to work in the territory of the East St. Louis local's jurisdiction. The permit entitled the holder member to work as a union member within said local's territorial jurisdiction for a period designated in such permit. The custom was to renew such permits from time to time until the holder's membership was transferred to the East St. Louis local union.

David F. Reed, referred to in the evidence as "Whitey Reed," testified that he was a structural ironworker, and that from about the first of March, 1939, up to and including the 17th of May of that year, he was working for the respondent employer at Scott Field near Belleville, Illinois; that he was a member of the East St. Louis, Illinois, local union but was living in St. Louis at that time. Referring to his trip across the river with Hunt, Jr., on the day the latter went to work at Scott Field, the witness testified:

"Q. Where did you meet him that day? A. At the Free Bridge.

"Q. Was that the first day he went to work there? A. Yes.

"Q. When he arrived on the job there with you that was the end of the journey? A. Yes.

. . . . .

"Q. When you and Mr. Hunt arrived on the job what did Mr. Hunt do, where did Mr. Hunt go, do you know? A. I took him into the office.

"Q. That's the office there on the job? A. Yes.

"Q. Who was there? Did you see Mr. Watson? A. Mr. Watson.

"Q. Now, did you hear any conversation between Mr. Hunt and Mr. Watson? Will you state what conversation took place there? A. I introduced Mr. Watson and Mr. Hunt.

"Q. You did; did you hear any conversation between Mr. Watson and Mr. Hunt when he got in there? A. Mr. Hunt says he's the apprentice that Mr. McCarthy sent for and sent out there.

"Q. What transpired from then on? A. We were there at 7:30. At eight o'clock he went to work with me; I mean Hunt.

"Q. Did Mr. Watson ask him any questions in your presence there? A. Only for his Social Security number.

"Q. Was that all? A. Yes.

"Q. And then what was done, if you know, with reference to him going to work? A. He told him to go to work with me, with my gang, and help pull sheets.

. . . . . . .

"Q. What happened after that? Will you state— A. That's all; he went to work and that's all.

"Q. He worked with your gang? A. He worked in my gang, yes."

The evidence further showed that details as to the duties, wages and hours of ironworkers and apprentices at the Scott Field job were all fixed by the rules of the union under the agreement between the union and the group of contractors and were so understood by all the parties. It is admitted that there had been no communications of any kind between Mr. Watson and Hunt, Jr., from the time Watson spoke to McCarthy making the request for two apprentice ironworkers until Hunt, Jr., appeared on the job at Scott Field in Illinois the following morning.

Appellants contend that there was not sufficient competent evidence in the record to warrant the making of the finding by the commission that the contract of employment was made in Illinois, and the further finding that the Missouri Commission was without jurisdiction. They further contend that the contract of employment was entered into in Missouri and became a Missouri contract. In support of these contentions appellants argue that the point of acceptance of a contract of employment is the place where the contract is consummated; that the place where the final act to complete the contract in this case occurred in Missouri in that the act of James Hunt, Jr., in starting to work constituted his acceptance of the offer of the contract of employment by an act in Missouri; that the contract of employment having been made in Missouri, the law of Missouri was applicable to and governed the accident regardless of where the accident happened.

Appellants, in further support of their contention, assert that the offer of employment was submitted by McCarthy to the employee while the employee was within the State of Missouri, and that the employee accepted such offer unqualifiedly by exclamations and by his acts and conduct subsequent to the submission of the offer to him by arranging for a method of conveyance in going to the job; that all of such acts and conduct of the employee having taken place in St. Louis, Mis-

souri, made the contract of employment a Missouri contract, thus giving the Missouri Workmen's Compensation Commission jurisdiction to hear and determine the claim. Appellants say that there were no conditions placed upon the offer of employment as made by Watson.

We are unable to agree with appellant's view. It conclusively appears from the evidence that there was a very definite limitation and condition stated by Watson in his conversation with McCarthy. When McCarthy told Watson that he didn't have anyone out of work belonging to the East St. Louis local union and would have to ge men from St. Louis, Watson said: "That's o. k. by me; just so you get them on the job tomorrow morning." "On the job," of course, had only one meaning, namely, on the job at Scott Field in the State of Illinois. The employee could not have gone "on the job" at any other place than at Scott Field, Illinois.

It is clear that Watson was acting for the employer, and we think it is equally clear that McCarthy, as business agent of the union, was acting as the agent of Hunt, Jr., as a member of the union, and not as agent of the employer. The entire arrangement between the union and the group of employers contemplated that in arrangments for the employment of the union members, the business agent of the local union was acting for such union members to receive for them offers of employment made by employers, and to notify the members of such offers. The evidence is undisputed that the employer was required to apply to the business agent for such union workmen as he desired. In no other way could the employer have procured union workmen. This was all in accordance with the agreement between the District Council of the ironworkers' union, representing the union members, and the employers, representing themselves. The union, therefore, through its business agent, had complete control over the furnishing of union workmen to the employer. This was further evidenced by the fact that Hunt, Jr., although a member of the international union, was required, under the local rules, to go to McCarthy to get a permit from him as the business agent of the local union having jurisdiction over the union members working at Scott Field.

One of the very objects and purposes of the agreement between the union on the one side and the employers on the other was that the business agent of the local union would be the union members' agent to whom the employer should apply for union workmen. In the light of that agreement and the practice and custom of all parties thereunder, which definitely established and fixed the relations between them, it most certainly could not be said that, by applying to the business agent of the local union for union workmen, the employer thereby made such business agent his agent. Furthermore, the offer of employment made by Watson was specifically conditioned upon McCarthy producing "on the job the following morning" an iron-

worker apprentice as requested. That condition was not complied with until Hunt, Jr., appeared "on the job the following morning," thereby accepting and completing the contract of employment in Illinois.

In 12 Am. Jr., section 37, page 530, it is said:

"To constitute a contract there must be an acceptance of the offer; until the offer is accepted both parties have not assented, or, in the figurative language frequently used by the courts, their minds have not met."

In Section 41, page 535, of the same work, it is said:

"In the case of an offer which requires a reciprocal promise, it is clear that mental determination to accept is insufficient to bind the party who makes the offer. To constitute acceptance of such an offer, there must be an expression of the intention, by word, sign, writing, or act, *communicated or delivered to the person making the offer or his agent.* A mere private act of the person to whom the offer is made does not constitute acceptance." (Italics ours.)

The general rule with respect to the phase of the law of contracts applicable to the evidence in this case is stated in Lawson on Contracts, Third Edition, section 23, page 38, as follows:

"The offerer has the right to prescribe the time, place, form or other condition of acceptance, in which case *the offer can be accepted only in the way prescribed by the offer.*" (Italics ours.)

The same author, in section 25, page 39, of the same book, says that, in order to make a binding contract, the offer must be accepted exactly as it is made; that the acceptance must in every respect meet and correspond with the offer, neither falling within nor going beyond the terms proposed but exactly meeting them at all points and closing them just as they stand.

While McCarthy, as business agent of the East St. Louis local union, undoubtedly had authority to receive from employers offers of employment and transmit same to the union members, there is no evidence whatsoever that he had any authority to bind either Hunt, Jr., or any other particular member of the union to an acceptance thereof.

The evidence is undisputed that McCarthy did not contact or talk with Hunt, Jr., at all. He talked only to Hunt, Sr. At the time McCarthy and Watson had their conversation, the identity of the union member to whom the offer was to be communicated was not known. Under the conceded facts, the employer therefore did not know whether he would have an additional employee or who he would be until Hunt, Jr., appeared "on the job" at Scott Field in the State of Illinois, thereby, for the first time, according to all the evidence, communicating to the employer in that State his acceptance of the offer and thereby complying with the conditions prescribed in the employer's offer. Until Hunt, Jr., appeared "on the job" at Scott

Field, there was no contract between him and the employer because up to that time there was but one party to the proposed contract. There was only a pending proposition with a condition attached.

In Lungstras v. German Ins. Co., 48 Mo. 201, 204, our Supreme Court said:

"It is true that no contract can arise from a proposition or offer on one side until it is accepted on the other; until then it remains merely a proposition. And it is also true that this acceptance must be evidenced by some act that binds the party accepting. A man's mental resolution, that can be changed, is not sufficient; both parties must be bound or neither will be."

In Williams v. Emerson-Brantingham Implement Co. Mo. App.), 198 S. W. 425, it was held that the communication to a third person, not the offerer's agent, of the acceptance of an offer is of no more effect than noting it is one's memorandum book, which is no more than though it existed in one's mind.

In Lee v. Dodd, 20 Mo. App. 271, it was held that a party to whom an offer had been made did not accept it so as to bind the offerer by merely telling his own attorney that he accepted it, or by telling some third person that he accepted it.

This case is quite different from the hypothetical case, suggested by appellants in their brief, wherein a person writes to a motor company in Detroit, Michigan, ordering said company to ship a certain type of automobile on a given date to the person ordering the same in another State, and in connection with which it is asserted by appellants herein that, when the motor company starts on its way to the person making such offer or order the type of automobile specified, then such act of the motor company constitutes an acceptance by such company of such order and the contract is completed by such act in Michigan, thus making it a Michigan contract. That the hypothetical case is not the same as the case at bar is so readily discernible that we think it unnecessary to labor the point. It is sufficient to say that in the hypothetical case we would be dealing with a completed merchandise order which could be and would be properly, fully, and finally accepted by the act of shipment in the State where the order was received and a completed contract thus made because that would be exactly what the offer or order called for; whereas, in the case at bar we are not dealing with merchandise but with the personal services of an ironworker apprentice who, in order to comply with the conditions of the offer, was required to be "on the job the following morning" in the State of Illinois where the offer of employment was first made to the agent (for limited purposes) of the employee.

We have examined the cases cited by appellants in support of their contention, and find nothing therein that would warrant us in holding, on the evidence in the case at bar, that the contract herein was made in Missouri instead of Illinois.

In Daggett v. Kansas City Structural Steel Co., 334 Mo. 207, 65 S. W. (2d) 1036, the facts were entirely different from those in the case at bar. It would unnecessarily extend the length of this opinion to set forth here the facts of that case. While it is true there was a finding in that case in favor of the employee that the contract of employment was made in Missouri although the work, out of which the injury arose, was being done in Kansas, the court in the course of its opinion therein nevertheless stated a principle of law which, while not applicable to that case on its facts, is clearly applicable and controlling on the facts of this case. In that case the court said:

"Of course, if an offer calls for the performance of an act, and further provides, either expressly or by necessary implication, that acceptance shall be made by performance of the act, *then the acceptance must be in the manner indicated in the offer.*" [Daggett v. Kansas City Structural Steel Co., 334 Mo. 207, 214, 65 S. W. (2d) 1036, 1039.] (Italics ours.)

In Sims v. Truscon Steel Co., 343 Mo. 1216, 126 S. W. (2d) 204, cited by appellants, the evidence made it very clear that the contract of employment therein was made in Missouri, but a reading of the case shows the evidence therein was quite different from that in the case at bar.

The other cases cited by appellants present the same situation as those above referred to. They are entirely different from this case on the facts. In none of them was there a condition attached to an offer of employment such as was shown in the case at bar.

In the view which we take of this case, it is unnecessary to discuss the question of dependency of appellants' presented by them.

The law is firmly established in this State that an award of the Workmen's Compensation Commission which is supported by competent evidence has the force and effect of the verdict of a jury; that in reviewing such an award, the appellate court can consider only such evidence as is favorable to support the findings of the compensation commission, and in reviewing such evidence all reasonable favorable inferences must be drawn in favor of such award. [Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601; Crutcher v. Curtiss-Robertson Airplane Mfg. Co., 331 Mo. 169, 52 S. W. (2d) 1019; Burgstrand v. Crowe Coal Co., 336 Mo. 119, 77 S. W. (2d) 97; Noto v. Hemp & Co., 231 Mo. App. 982, 83 S. W. (2d) 136.]

Applying the above-mentioned rules to the evidence in the case at bar and having in mind the principles of the law of contracts heretofore referred to, we think the conclusion is inescapable that there was ample competent evidence in the record to warrant the Workmen's Compensation Commission of Missouri in making the finding and award denying compensation on the grounds that the contract of employment involved herein was made in the State of Illinois, and that the accident wherein the employee sustained injuries causing his

death having also happened in the State of Illinois, the compensation commission of Missouri was without jurisdiction to make any award for compensation. [See Section 3700(b), R. S. 1939, Mo. Stat. Anno., sec. 3310(b), p. 8245.]

It necessarily follows that we must hold that the circuit court's action in affirming the finding and award of the Workmen's Compensation Commission denying compensation on the grounds stated should be affirmed. It is so ordered. *Hughes, P. J.,* and *Anderson, J.,* concur.