Anna Teague and Dorothy Teague v. Laclede-Christy Clay Products Company, a Corporation, and American Mutual Liability Insurance Company, a Corporation, Appellants.—52 S. W. (2d) 880.

Division One, September 3, 1932.

*Wm. R. Schneider* and *J. J. Cooney* for appellants.

148

*Jesse W. Barrett* for respondents.

FRANK, J.—This is an appeal by an employer and insurer from a judgment of the Circuit Court of the City of St. Louis reversing an order of the Workmen's Compensation Commission which denied compensation to the dependents of a deceased employee.

Prior to his death the deceased, Cary F. Teague, lived with and maintained his wife and daughter, the claimants, who were totally dependent on him. Teague was in the employ of the Laclede-Christy Clay Products Company as salesman in the States of Minnesota, Iowa and Michigan, having no fixed headquarters, and being free to call upon any customer or prospective customer as he saw fit, occasionally being given specific suggestions by the employer as to calls which should be made. He traveled his territory by automobile, the employer allowing him seven cents per mile expense for automobile trips for business in lieu of railroad fare. His salary was $3,600 per year. On June 17, 1929, he started from Duluth to Mankato, Minnesota, and when about forty miles south of Duluth his automobile overturned and he was instantly killed. The commission found that the accident causing his death did not arise out of and in the course of his employment and denied claimants compensation therefor. The findings made by the commission are set out in the findings and judgment of the circuit court. We quote therefrom the findings of the commission as follows:

"This is a proceeding under the Workmen's Compensation Act of Missouri by Anna P. Teague, widow, and Dorothy Teague, daughter, for compensation for the death of their husband and father, Cary F. Teague, opposed by the Laclede-Christy Clay Products Company, Employer, and American Mutual Liability Insurance Company, Insurer. An award of compensation was denied by the Workmen's Compensation Commission, and the widow and daughter took an appeal to the Circuit Court of the City of St. Louis.

"The claim and the answer thereto, filed with the commission, constitute the pleadings in the case. In the claim it is alleged that the death of Cary F. Teague was caused by an accident arising out of and in the course of the employment. In their answer the employer and insurer admit all other statments in the claim for compensation, but deny that the accident arose out of and in the course of the employment of the deceased.

"The commission, on May 15, 1930, made the following findings, which it called 'Statement of Facts and Rulings of Law:'

"Statement of Facts and Rulings of Law.

"On review, award dated March 11, 1930, is affirmed as to result, but the Statement of Facts and Rulings of Law is hereby reversed and set aside with the following findings: The sole question in this case is as to whether employee's death resulted from an accident arising out of and in the course of his employment. On Friday, June 16, 1929, the deceased and one Sullivan came from Duluth to Minneapolis, and a lady by the name of Miss Sponnick accompanied them on this trip. All three of them registered at the Nicollet Hotel in Minneapolis, and on Saturday, June 17, the deceased and Sullivan tended to some business in Minneapolis which they were working together. They finished said business on Saturday and Sullivan intended to go back to his home in Duluth, but Teague asked him to stay over until Sunday morning and go with him to see a prospective customer by the name of Carlson, who lived in St. Paul. The next morning they went to Carlson's in St. Paul, and on the way over they took Miss Sponnick to a party's home by the name of Shores, in St. Paul. They went on out to Carlson's and, according to Sullivan's testimony, they remained there about 2½ hours. Sullivan states that he wanted to take a train from Minneapolis to Duluth, which train left at 4:00 P. M., Sunday afternoon, although he does testify that Teague insisted that he allow him to drive him back. However, Sullivan testifies that they left Carlson's and as Teague wanted to stop at Shores' house they stopped there about 2:30 Sunday afternoon. He testified that Teague said he was going to run in and then he would come down and drive him over to Minneapolis to get his baggage. Then after Teague went into the Shores' house, he called back and Sullivan went into the house. They stayed at Shores' until about 5:00 or 5:30 Sunday afternoon, and then Teague, Sullivan, Miss Sponnick and Mr. and Mrs. Shores went to Minneapolis. Sullivan checked out of the hotel about 11:30 P. M. Sullivan and Miss Sponnick went to their home in Duluth and on the return trip Teague was killed.

"From the testimony as set out above, it appears clear that Sullivan intended to catch the 4 o'clock train from Minneapolis for Duluth. That they arrived at the Shores' about 2:30 and Teague stated he was going to run in and then he would drive Sullivan over to get his baggage at Minneapolis and catch the said 4 o'clock train, and that they had adequate time to do same, but after Teague went into the Shores' he decided to drive to Duluth for the purpose of taking Miss Sponnick. That Sullivan went with them, but said trip was in no way made for the purpose of taking Sullivan to Duluth. Therefore it cannot be said that the accident causing Teague's death arose out of and in the course of his employment, as he took this

trip for personal reasons rather than for any reason connected with his employment.''

After quoting the findings made by the commission the court proceeded as follows: ''It is obvious that the finding of facts made by the Workmen's Compensation Commission relates exclusively to events and circumstances preceding the day of the accident. These findings being immaterial and irrelevant as to the issues here presented, it is unnecessary for this court to either reverse or affirm said findings of fact. This court finds from the evidence the following facts:''

The court then proceeded to make its own finding of facts, including a finding that Teague's death was caused by an accident arising out of and in the course of his employment and that claimants were entitled to an award of compensation therefor, then reversed and remanded the cause to the commission with directions to make an award in conformity with the findings of the court.

Under the plain mandate of the statute neither the circuit court nor this court has power or jurisdiction to make findings of fact in any case arising under the Workmen's Compensation Act. Such power and jurisdiction by the express terms of the act, is given to the commission. The pertinent part of Section 3342, Revised Statutes 1929, reads as follows:

''Upon appeal no additional evidence shall be heard and in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

''1. That the commission acted without or in excess of its powers.

''2. That the award was procured by fraud.

''3. That the facts found by the commission do not support the award.

''4. That there was not sufficient competent evidence in the record to warrant the making of the award.''

It has been said that, ''The Workmen's Compensation Act not only vests in the commission the power to find the facts in all cases which arise under the act, but expressly withholds that power from circuit courts and appellate courts. A circuit court and an appellate court may, when the question is properly presented, determine whether the finding of facts of the commission are supported by sufficient competent evidence. But the value of the evidence, as well as the reasonable inference to be drawn therefrom, is for the commission and not for any of the constitutional courts.'' [Beecham v. Greenlease (Cadillac) Motor Co., 38 S. W. (2d) 535, 537.]

For the reasons stated, we will disregard the finding of facts made by the circuit court and proceed to determine whether or not there is sufficient competent evidence in the record to warrant the making of the award which was made by the commission.

■ Teague was employed by the Laclede-Christy Clay Products Company to sell building material such as fire brick, fire clay, etc. One R. F. Sullivan was a salesman for Standard Salt and Cement Company of Duluth, Minnesota, handling building material such as reinforced steel, cement, etc. Teague and Sullivan found it advantageous to work together as they handled different kinds of building material and could both sell their products to the same customer. In fact their companies advised them to aid and assist each other. On Friday, June 14, 1929, Teague and Sullivan left Duluth for Minneapolis in Teague's car. A Miss Sponnick accompanied them. They went to the Nicollet Hotel in Minneapolis. On Saturday, June 15, 1929, they secured an order for building material from the Paul A. Laurence Company. Concerning events which happened thereafter, Sullivan testified on direct examination as follows:

"We got that order on June 15th which was on Saturday. My home is in Duluth, but I did not go there that Saturday. We saw manufacturers' builders in Duluth. Teague had a manufacturer's dealer in St. Paul, who was a personal friend, Harry Carlson, St. Paul Builders' Supply Company. Harry Carlson, of that company, is a personal friend of mine. Teague told me that Carlson was his dealer in St. Paul, and I told him if there was anything I could do to help him with Carlson, knowing Carlson intimately, so he had said that some deals coming up in St. Paul he expected he and Carlson would work on together, and if convenient for me he would like for me to stay over and see Mr. Carlson Sunday morning at Carlson's home. So I did that. I had no pecuniary or financial interest in this visit to Carlson, that was done as a favor to Mr. Teague. We stayed at Mr. Carlson's home that Sunday morning about two and one-half hours. I was not working with Mr. Teague on any joint account or commission. Neither of us had any commission arrangement with the other. Each of us were paid by our own company. When Mr. Teague went with me on my order, Laclede-Christy would get the business rather than A. P. Green or some other company. When we had finished our business with Carlson I had missed my train for home and Mr. Teague wanted to drive me home. He probably felt more or less obligated. He said he was obligated being that I went over to Carlson's with him and was late getting away from there. I had told Teague beforehand I would just as soon go home on the train, he said he would drive me up, he wanted to any way and talk about other business, and if I missed the train he would

see that I got home that afternoon. We started from Duluth that afternoon from St. Paul about 5 o'clock and between 6:00 and 6:30 from Minneapolis. I sat in the front seat and he drove. We talked business on the way to Duluth. There were various jobs we had been working on. I don't remember all of the jobs we discussed. When Teague offered to take me to Duluth in his car I objected to that, but not when it was too late to take the train. I told him I'd just as soon go home on the train. I wanted to be sure to get the afternoon train that evening in case he'd have to get out the; just as soon take the train and save him driving up. He insisted on driving and we talked business on the way home. We reached Duluth at approximately 11:30. I left his car about three miles from my home and took a street car. I don't know where he went after that. He was going to go back through the southern part of the State to Mankato. I don't remember the other towns.''

On cross-examination he said:

''A. . . . We had finished our business with Mr. Carlson at 2:30.

''Q. Wouldn't that give you sufficient time to have got the 4 o'clock Great Northern train up to Duluth? A. Possibly. When we got over to Shores, Teague said it would take me more than an hour to drive over to Minneapolis and I'd possibly miss the train when I got there. Carlson was in St. Paul.

''Q. When you left Carlson did you make any suggestion that you would be able to get the 4 o'clock train back to Duluth? A. I said, if I got over there on time, I'd just as soon take the train. That was before we left Carlson. Teague said he would drive me up.

''Q. Then it wasn't because you had missed the 4 o'clock train and that there wasn't any other train that would get you up there that night was the reason you went up by automobile? A. He said he wanted to drive me up all the time. He mentioned two or three times he'd drive me up and I insisted it wasn't necessary, that I would just as soon go on the train.

''Q. But it wasn't because you had missed the 4 o'clock train and you were compelled to go up by automobile in order to reach Duluth that night, is the reason you went by automobile? A. I didn't know whether I would miss the train if I tried to make it.

''Q. You had an hour and a half to make that train from the time you left Carlson's? A. Street traffic would be heavy, maybe I would get through, maybe not.

''Q. You didn't make any inquiries? A. Not as long as I knew I was going to get there that evening.

154

"Q. Were you directed by your company to make joint efforts with Mr. Teague to secure business for the Laclede-Christy products? A. Yes, sir . . ."

Other witnesses testified without contradiction that on the return trip from Duluth, Teague intended to go directly from Duluth to Mankato to see a prospective customer. His company had notified him of a prospective customer at Mankato. He had his sample case with him and told witnesses that he was going from Duluth direct to Mankato. The road on which he was traveling at the time he was killed was a direct route from Duluth to Mankato. Mr. and Mrs. Shores who were returning from Duluth with Teague lived on the direct route from Duluth to Mankato.

Other evidence will be noticed in the course of the opinion.

The commission found, among other things, the following:

"From the testimony as set out above, it appears clear that Sullivan intended to catch the 4 o'clock train from Minneapolis for Duluth. That they arrived at the Shores' about 2:30 and Teague stated he was going to run in and then he would drive Sullivan over to get his baggage at Minneapolis and catch the said 4 o'clock train, and that they had adequate time to do same, but after Teague went into the Shores' he decided to drive to Duluth for the purpose of taking Miss Sponnick. That Sullivan went with them, but said trip was in no way made for the purpose of taking Sullivan to Duluth. Therefore it cannot be said that the accident causing Teague's death arose out of and in the course of his employment, as he took this trip for personal reasons rather than for any reason connected with his employment."

The first conclusion of the commission is that it clearly appears from the evidence that Sullivan intended to catch the four o'clock train from Minneapolis to Duluth. This conclusion is not supported by the evidence. The evidence on that subject is that Teague at all times said that he would drive Sullivan to Duluth. Before they left Carlson's house he told Sullivan that he would drive him home. While Sullivan did say that he would just as soon go on the train and save Teague the trip, there was no evidence that Sullivan refused to accept Teague's proposal, or that they made any effort to catch the train, or that they would have had time to make the train if they had attempted to do so.

The next conclusion of the commission is that when Teague and Sullivan drove by Shores' house, Teague said he was going in, then he would drive Sullivan over to get his baggage at Minneapolis and catch the four o'clock train, and that they had adequate time to do so. The evidence does not support this conclusion. Teague did say that he was going into the house, then he would drive Sullivan

over to Minneapolis and get his baggage, but he did not say they would catch the four o'clock train. The fact that he intended to drive Sullivan to Minneapolis and get his baggage is as consistent with the idea that he intended to drive him to Duluth as that he intended to take him to the four o'clock train. In either event Sullivan would want his baggage. Likewise there is no evidence that they had adequate time to catch the four o'clock train. Sullivan's testimony on that subject was that he did not know whether or not they would have missed the train if they had tried to make it; that the street traffic was heavy—they might and they might not have made it; that as he knew he was going to get to Duluth that evening, he made no inquiry. Teague told Sullivan it would take more than an hour to drive to Minneapolis and they probably would miss the train when they got there.

The final conclusion of the commission is that after Teague went into Shores' house he decided to drive to Duluth for the purpose of taking Miss Sponnick; that Sullivan went with them but the trip was not made for the purpose of taking Sullivan to Duluth. Therefore, it could not be said that the accident causing Teague's death arose out of and in the course of his employment.

The commission set out in its findings all of the evidence upon which it based its conclusion that Teague arranged to go to Duluth for the purpose of taking Miss Sponnick, after he went into Shores' house on their return from Carlton's. An examination of the evidence considered by the commission does not support this conclusion. The evidence is that Teague at all times intended to drive Sullivan to Duluth. He so told Sullivan before they left Carlson's house. Other evidence not mentioned by the commission sheds light on this question. When they drove from Carlson's to Shores' house, Teague went into the house and Sullivan remained in the car. Sullivan testified that Teague called back to him and said, "he wanted to ride back with us." Evidently Teague said, "she (meaning Miss Sponnick) wanted to ride back with us" but through typographical error the word "he" was substituted for the word "she." But regardless of the person to whom Teague was referring, what he said clearly tends to show that he and Sullivan had theretofore arranged to drive back to Duluth and some one in the house wanted to ride back with them. Miss Sponnick testified that she had intended to go back on the train or bus and so told Teague when he came into the house, and Teague said in reply, that he intended to drive Mr. Sullivan right back. The evidence thus far considered did not warrant the commission in finding that the trip was made to Duluth for the purpose of taking Miss Sponnick home. On the contrary, it tended to show that the trip was made for the purpose of taking

156

Sullivan home. The only other evidence in the record touching the question is that of Mr. Shores. He testified, "The trip to Duluth was arranged when Mr. Teague came to our hourse. Miss Sponnick wanted to go home. Sullivan wanted to go home and she wanted to go too, and it was suggested that Teague take them up in the car."

Shores' evidence does not shed any light on the question we are to determine. The commission found that the trip to Duluth was made for the purpose of taking Miss Sponnick home. If it should be conceded that the trip was arranged after Teague came to Shores' house, Shores' evidence that both Sullivan and Miss Sponnick wanted to go home, and the suggestion was made that Teague take them, does not support the commission's finding that the trip was made for the purpose of taking Miss Sponnick. In other words, evidence that arrangements were made to take both Sullivan and Miss Sponnick does not support the commission's finding that the sole purpose of the trip was to take Miss Sponnick.

Section 3 of the Compensation Act provides that: "If both employer and employee have elected to accept the provisions of this act, the employer shall be liable irrespective of negligence to furnish compensation under the provisions of this act for personal injury or death of the employee by accident arising out of and in the course of his employment, and shall be released from all other liability therefor whatsoever, whether to the employee or any other person.. [Laws 1927, p. 492.]

█ As said by us in the recent case of Leilich v. Chevrolet Motor Company, 328 Mo. 112, 40 S. W. (2d) 601, 605, "There is no justification for investing the words 'arising out of . . . his employment' with a technical meaning; they are plain, ordinary, and every day words, and should therefore be given their plain, usual and ordinary meaning. Every case involving their application should be decided upon its own particular facts and circumstances and not by reference to some formula."

Teague's superior, John H. McKelvey, testified that he would consider it within Teague's duty to render any courtesy or service to Sullivan or his company that would help in getting business. If McKelvey's evidence be true, and if Sullivan stayed over in Minneapolis for the purpose of assisting Teague in getting his company some business from one Carlson, and Teague took him to his home in Duluth as a courtesy or service to him for his assistance in the deal with Carlson, then Teague was in the line of his duty to his employer while driving Sullivan to Duluth and returning therefrom, and the accident which caused his death on the return trip arose out of and in the course of his employment.

On the other hand, if, as the commission found, Teague made the trip to Duluth for the purpose of taking Miss Sponnick and not for the purpose of taking Sullivan, then the trip was made for personal and not business reasons, and the accident causing Teague's death did not arise out of and in the course of his employment.

For reasons heretofore stated, it is our judgment that there is not sufficient competent evidence in the record to support the finding of the commission that Teague made the trip to Duluth for the purpose of taking Miss Sponnick home, and for that reason the denial of compensation based on that finding cannot be permitted to stand.

The circuit court went beyond its jurisdiction in making its own finding of facts and directing the commission to make an award in accordance with such findings. [Sec. 3342, R. S. 1929.]

The judgment of the circuit court is reversed and cause remanded with directions to the circuit court to remand the cause to the commission for further proceedings. All concur.