BERENICE PHILLIPS v. AIR REDUCTION SALES COMPANY and GLOBE INDEMNITY COMPANY, Appellants.—85 S. W. (2d) 551.

Division One, July 30, 1935.

*Watson, Ess, Groner, Barnett & Whittaker* for appellants.

590

*Stubbs, McKenzie & Stubbs* and *Cramer & Haase* for respondent.

HYDE, C.—This is an appeal from the judgment of the Circuit Court of Jackson County affirming an award of the Workmen's Com-

pensation Commission, in favor of respondent as the total dependent of Sam Missey who was killed in the plant of the Air Reduction Sales Company in Kansas City on August 6, 1933. Respondent was awarded the sum of $20 per week for three hundred and eighty-three and seven-tenths weeks and $150 for burial expenses.

The Air Reduction Sales Company was engaged in the manufacture of oxygen, with plants in both St. Louis and Kansas City. Missey was employed in the St. Louis plant until 1931 when he was transferred to Kansas City. He was the superintendent in charge of the company's Kansas City plant. He had authority to hire men and supervise their work. His superior officer was the district superintendent. He would give instructions to Missey, but the men who worked in the plant and operated the machinery never got orders from anyone except Missey. The plant was kept in continuous operation. The men, who operated the machinery, worked in three shifts of eight hours each; from midnight to eight A. M., from eight A. M. to four P. M., and from four P. M. to midnight. One man was in charge as operator on each shift. During 1933, Missey operated the machinery himself on the shift from eight A. M. to four P. M. on Mondays, Tuesdays, Wednesdays and Thursdays. One of the regular operators had been injured in February and, from that time until Missey was killed, Miller, who was employed as tester of cylinders, worked as a relief operator on the eight A. M. to four P. M. shift on Saturdays and Sundays. The other regular operators were Hetrick and Rockey. Missey had reports to make on Saturday and usually worked on his reports on that day. He was supposed to have Sunday off, but was subject to call at any time. He had instructed the operators that if they "had a breakdown or got into trouble and needed help to call him." He came to the plant at any time he saw fit to do so and frequently did come there in the evening. Sometimes he would not come at night all week and sometimes "he would come three or four times in a week" and was "liable to be doing anything." When he came at nights, Missey would discuss what was going on, would make suggestions to the operator about his duties, and he also at times worked on his reports. Repairs on all machinery were under his supervision and most of the time he would make them himself.

The plant consisted of three rooms. In the southeast corner was an office, which Missey used to make out his reports; next to it in the southwest corner was a room, which contained machinery called the testing apparatus. North of these two rooms, there was a large room, which contained the machinery for the manufacture of oxygen. In the north part of this large room, there was an air compressor with a large flywheel about eight feet in diameter; and along the south side of the room was what was called the filling line where

cylinders were filled with oxygen. It was shown that the bearing on the flywheel leaked oil, so that oil would get on the journal or crank shaft. If this oil was not wiped off, it would drop onto the belt of the flywheel and cause it to slip. Missey gave orders to all of the operators to "take a rag and wipe off that crank shaft" about every hour, and "always done it on his shift." Operator Rockey said that although he had been instructed to wipe off this oil, he never did it because he thought it was dangerous, and "didn't want to take the chance of going around there." Operator Hetrick said that he did wipe it off like he had been ordered to do. Relief operator Miller said that he wiped the oil off several times after Missey told him to do so, but that he figured it was too dangerous and discontinued it. He said he told Missey that he would not do it and that Missey agreed that he could let it go. There was also another place where oil drained out at the end of the compressor and two buckets were kept there to catch the oil. Sometimes some of it got on the floor. The flywheel had a screen or guard on the south side but was without protection on the north. About two months after Missey was killed, a screen or fence was put there so that it was possible to stand against the fence, within a few inches of the flywheel, and get to the journal safely.

On Sunday, August 6th, Missey came to the plant and started to make certain changes, about the testing apparatus, which had been ordered some time before by the district superintendent. Miller, who was on duty at the time, said that he was intoxicated; that he staggered around; and that he smelled liquor on his breath. He said that Missey went into his office and stayed for some time and then went into the testing apparatus room and went to work on that machine and wanted him to help him. He said Missey dropped several wrenches, stumbled around, cut a pipe too short so that he ruined it, and that he then "went in and straightened the situation out, replaced the piece of pipe and cut new threads on it," and otherwise helped Missey with the work. That night about ten-thirty P. M., while operator Rockey was on duty, Missey came to the plant again. Rockey said that he appeared to be intoxicated; that he did not stagger but that he "smelled stuff that smelled like what they call corn whiskey" on his breath. He said Missey worked on the testing apparatus for twenty or twenty-five minutes. Rockey said that he helped him with this work, and said that Missey "had had a little trouble getting done what he was trying to do." Rockey said that then they came out of this room together; that he "went over to the filling line to look at the pressure on the cylinders;" and that he guessed that Missey "went on around to the air compressor." After he looked at the filling line, he turned around to look at the column and "heard kind of a dull thugging." He went to the air

compressor and found Missey near the flywheel with the top of his head torn off. The top of his head was "lying over by the column," about fifteen feet away, and "the brains was all over the floor around there." Both Rockey and Hetrick testified that Missey had on other occasions come there in the evening in an intoxicated condition. They said, however, that they never saw him stagger. Drinking was against the rules of the employer.

Appellants contend that there was no substantial evidence to support the finding of the commission that the accident which resulted in Missey's death was one arising out of and in the course of his employment. Appellants' argument is that the evidence shows nothing more than the mere lawful presence of the employee upon the premises of the employer; that there is nothing to show that Missey had any duty to perform at the compressor or that he went there to do anything connected with its operation; and that the award, therefore, rests merely upon speculation, surmise and conjecture. Appellants say:

"The only reasonable inference to be drawn from the record is that Missey was led to come to the plant at 10:30 on the Sunday night in question by reason of his intoxication, or for want of a better place to go, and it is far more probable and reasonable to suppose that he was led to the vicinity of the flywheel by the aimless wandering of a drunken man or for personal reasons and reasons wholly disconnected with his employment as superintendent, than it is to suppose that he had and was performing any duties required of him."

We think appellants' statement of the matter fails to give respondent the benefit of her most favorable view of the testimony and the inferences that may be reasonably drawn therefrom. The award of the commission has the force and effect of the verdict of a jury and the court must presume that it found every fact, upon the issues properly submitted, of which there was substantial evidence, necessary to support the verdict. [State ex rel. Buttiger v. Haid, 330 Mo. 1030, 51 S. W. (2d) 1008; State ex rel. Probst v. Haid, 333 Mo. 390, 62 S. W. (2d) 869.] Any of the commission's findings of fact, which are supported by substantial evidence are conclusive. [Gillick v. Fruin-Colnon Const. Co., 334 Mo. 135, 65 S. W. (2d) 927; Shroyer v. Missouri Livestock Comm. Co., 332 Mo. 1219, 61 S. W. (2d) 713; Teague v. Laclede Christy Clay Products Co., 331 Mo. 147, 52 S. W. (2d) 880; Crutcher v. Curtiss-Robertson Airplane Mfg. Co., 331 Mo. 169, 52 S. W. (2d) 1019.]

In Wahlig v. Krenning-Schlapp Grocer Co., 325 Mo. 677, 29 S. W. (2d) 128, it is said:

"It has been quite uniformly held that an injury arises 'out of' the employment when there is a causal connection between the con-

ditions under which the work is required to be performed and the resulting injury; and that an injury to an employee arises '*in the course of*' his employment, when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment, or engaged in doing something incidental thereto.'' [See, also, Shroyer v. Missouri Livestock Comm. Co., 332 Mo. 1219, 61 S. W. (2d) 713; Crutcher v. Curtiss-Robertson Airplane Mfg. Co., 331 Mo. 169, 52 S. W. (2d) 1019; Teague v. Laclede Christy Clay Products Co., 331 Mo. 147, 52 S. W. (2d) 880; Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601; Ransdell v. International Shoe Co., 329 Mo. 47, 44 S. W. (2d) 1.]

The evidence shows that Missey was superintendent of the plant; that he went there both on Sunday morning and on Sunday evening and worked on changes on the testing apparatus which he had been ordered by the district superintendent to make. It is at least a reasonable inference that he went there for that purpose, and that it was the proper time to make them. The evidence is that he had the right to take Sunday off and to take other times off, but that he had no regular hours except on the days he acted also as an operator, and that on those days and all other days and nights he was subject to call. He had supervision of the work and the operators at all times. He also had supervision of the machinary, inspected it and repaired it. The only part of the machinery, which was shown to need frequent attention, was the journal of the flywheel. It had to be wiped off to keep oil from getting on the belt, or the belt would slip and impair the efficiency of the machinery. The evidence is that Miller, who was on duty from eight A. M. to four P. M. had told Missey that he would not wipe it off. Rockey said he did not do it. Therefore, no one had done it since eight A. M. that morning, unless Missey wiped it off himself when he was there in the morning. If the evidence is to be believed, there must have been some oil on the journal by eleven o'clock that night. Knowing that his instructions about this matter were not being carried out by all of the operators and feeling that it should be done hourly (as he must have when he gave such instructions), is it mere surmise, speculation, and conjecture to say that Missey had a purpose connected with his duties as superintendent of the plant when he went from the testing room to this compressor? We think not, and hold instead that this was a reasonable inference to be drawn from the testimony. The commission necessarily so found and we are bound by it.

■ The evidence is not clear as to the degree of Missey's intoxication that night. Appellants do not contend that there is anything in our Compensation Act which forfeits the right to compensation

upon a showing that an employee had been drinking before going to work. Some states have made specific provisions concerning it. [See 1 Schneider's Workmen's Compensation Law, 1136, sec. 340.] If there should be similar provisions in our act, it is for the Legislature to provide them, not this court. Until the Legislature sees fit to do so, we cannot deny compensation because of intoxication, at least unless it was shown that the degree of intoxication was such that it could be held that the injury did not arise out of the employment because the employee could not have been engaged in it. Employers will have to enforce their rules against drinking by discharging offending employees, or by such other disciplinary measures as they see fit to adopt. Reduction might be claimed for violation of rules under Section 3301, Revised Statutes 1929, if an employer has complied therewith.

Appellants cite State ex rel. Probst v. Haid, supra, where we said that the evidence warranted the conclusion that "the injured employee was not aiding a fellow employee and was not performing any service to his employer, but was wandering around where his duties did not require him to be, for some other purpose." There an employee, who had been drinking, was killed at a place "he had nothing to do with," where he had never before been seen, and where the commission found that he did not go "for any purpose connected with or related to his employment." That is not true here. Missey's duties required him to properly keep in operation the belt of the flywheel where he was killed. In fact, it seems that he went there more frequently than anyone, because two of the other three operators were afraid to go there and wipe off the journal. Moreover, it was his duty as superintendent to be, at intervals, "wandering around" to some extent over the plant for the purpose of observing the operation thereof and inspecting the machinery under his supervision. It is necessary in the conduct of every industrial plant for some one to inspect the operating machinery at reasonable intervals. This is, of course, not the duty of an employee who has one definite and specific task, and the cases cited by appellants are of that character. We hold that the finding of the commission that Missey's death was caused by an accident arising out of and in the course of his employment must be sustained.

■ Appellants contend that respondent is not entitled to an award of compensation because she was the sister of Missey and he was not legally liable for her support. Respondent relies upon Elihinger v. Wolf House Furnishing Co., 72 S. W. (2d) 144, in which the St. Louis Court of Appeals held that the act authorized an award of compensation to an actual as well as a legal dependent. The St. Louis Court of Appeals certified the Elihinger case here because it considered its opinion in conflict with the decision

in Hill v. Nafziger Baking Co., 227 Mo. App. 846, 57 S. W. (2d) 773, by the Kansas City Court of Appeals, which is appellant's authority for their position. Concerning the Hill case, the St. Louis Court of Appeals made the following comments:

"In that case the court said:

" 'The act designates the class who are dependents, but it does not define the term "dependency." In the absence of legislative definition of the term, courts will hold it means legal dependency, for the reason that courts will enforce legal obligations but will not enforce mere moral duties.'

"It is true, as stated in the Hill case, the word 'dependency' is not defined in the statute, but appellants are in error in stating in their brief that the word 'dependent' is not defined therein. We are of the opinion that the Legislature having provided a clear definition of the word 'dependent,' it was unnecessary to define the word 'dependency.' "

The conclusion of the St. Louis Court of Appeals about this matter was thus stated:

"The argument thus presented fails to take into consideration the plain and simple definition of the word 'dependent' which the Legislature has provided in the Workmen's Compensation Act itself. It is as follows: 'The word "dependent" as used in this chapter shall be construed to mean a relative by blood or marriage of a deceased employee, who is actually dependent for support, in whole or in part, upon his wages at the time of the injury.' [Section 3319(d), R. S. 1929, Mo. Stat. Ann., sec. 3319(d), p. 8254.]

"Following the above definition of 'dependent,' the statute, in subdivisions 1 and 2 of the same subsection (d) above referred to, describes the person who shall be conclusively presumed to be totally dependent for support upon a deceased employee, after which it provides, in the latter part of subdivision 2, as follows: 'In all other cases questions of total or partial dependency shall be determined in accordance with the facts at the time of the injury.' . . .

"Under the plain and unambiguous terms of this statute, in cases of claimants not within the class of those conclusively presumed to be totally dependent, the only elements required to be proved to show dependency are: First, that the alleged dependents are relatives by blood or marriage of the deceased employee; and, second, that they were at the time of the injury actually dependent for support, in whole or in part, upon the wages of the deceased employee.

. . .

"The law specifically provides that all of its provisions shall be liberally construed. [Sec. 3374, R. S. 1929, Mo. Stat. Ann., sec. 3374, p. 8293.] Viewing the question before us in the light of our duty to give the law a liberal construction, and to carry out the

intention of the Legislature, as expressed in the Workmen's Compensation Law itself, we are unable to agree with the contention of appellants that the definition of 'dependent,' prescribed by the Legislature, should be construed so as to require proof of a legal obligation, or legal liability of the deceased employee to render support to claimants, as a prerequisite to an allowance of benefits for their son's death. The statute itself having provided a complete, clear and unambiguous definition of the word 'dependent,' and a complete rule for determining dependency, we are not authorized to go outside of its provisions to find a definition of that word, and a rule to apply herein. . . . We are of the opinion that it is immaterial, in this case, whether the deceased employee was or was not under a legal obligation to support his parents in view of the statutory definition of 'dependent.' "

We hold that this is the correct construction of the provisions of the Workmen's Compensation Act concerning dependents, who are entitled to awards of compensation, and adopt the conclusions of the St. Louis Court of Appeals above set out, as we have in the Elihinger case itself certified to us as above stated and decided concurrently herewith. [Elihinger v. Wolf House Furnishing Co., 337 Mo. 9, 85 S. W. (2d) 11.] The cases of Hill v. Nafziger Baking Company, supra; Glaze v. Hart, 225 Mo. App. 1205, 36 S. W. (2d) 684; Kennedy v. Keller, 225 Mo. App. 561, 37 S. W. (2d) 452, and Isaacson v. Central Coal & Coke Co., 226 Mo. App. 644, 44 S. W. (2d) 232, are all cases of minor children, who were not living with their father upon whom they claimed to be dependent. Under these circumstances, the matter of legal liability for their support is held to be essential in determining whether they are entitled to an award of compensation as dependents. Such cases are not in point here.

Appellants also contend that respondent did not show that she was actually dependent upon her brother, Sam Missey, at the time of his death and therefore was entitled to no award whatever. Appellants' position is that respondent showed only that she had no property, and that she had been receiving contributions. They say: "Claimant must go further in order to carry the burden of establishing actual dependency and show a present inability or incapacity to earn a livelihood because of the disability of age or non-age or because of physical or mental incapacity, and that she is unable by her own efforts to maintain herself, either in whole or in part." A fair statement of respondent's evidence upon the issue of dependency is made in appellants' brief as follows:

" 'The claimant and her sister, Evelyn, who lived with her, were the only witnesses before the Commission on the question of claimant's dependency. The claimant, Berenice Phillips is a sister of

the deceased employee. She is a widow and lives in St. Louis with her sister, Evelyn Missey, and her 11-year-old son. The other members of decedent's family are his mother, Mrs. Frances Mueller, his sister, Mrs. Nellie Smoot, his brother, Harry Missey, all of whom live in St. Louis; a brother who lives in California, and another brother whose residence was unknown. Claimant's husband died in 1926, and the claimant and her sister testified that deceased went to live with her a few months thereafter and lived with her continuously from that time until his departure for Kansas City in February, 1931, and during all of that time turned over to claimant all of his earnings, and defrayed all of the expenses of the household, except for certain small contributions made by Evelyn. Evelyn was employed about half of the time, and while employed gave claimant about $15.00 or $20.00 a month, contributing nothing when she was not working. Claimant and her sister further testified that her contributions were not made as board, nor was she a roomer for a price, and there was no agreement or arrangement between her and the claimant whereby she was to pay a definite sum to the claimant. Evelyn lived with the claimant during all of said time, except for a short period from February to June, 1933, during which period she resided with the mother. Evelyn's contributions to claimant had ceased when she went to live with the mother in February, 1933, and from that time on Evelyn had contributed to the support of the mother. The claimant testified that the mother's present husband had become insane about February 1, 1933, but at the time of the hearing before the Commission he was no longer insane but was merely out of a job. After decedent's transfer to Kansas City in February, 1931, he sent claimant the sum of $40.00 every two weeks for the first two months, and thereafter until his death the sum of $35.00 every two weeks. Both the claimant and her sister testified that the claimant had no means of support other than these biweekly contributions by the deceased, and was solely dependent upon them for her support. On cross-examination at the hearing before the Commission, and when asked whether or not deceased had made any contributions to the mother, the claimant twice answered, 'Not that I know of,' and testified that the sister, Evelyn, helped to support the mother. Evelyn testified on cross-examination that the claimant had not been employed since her marriage.''

Appellants offered no evidence upon this issue and brought out nothing on cross-examination, concerning respondent's age, condition of health or ability to earn a living for herself. It was also shown that when Sam Missey was transferred to Kansas City, respondent moved to a three-room house with her minor son and her younger sister; that Sam Missey kept books, papers, and other belongings there; that he spent his vacations there; and that Evelyn's

earnings after February, 1933, went to her mother and not to respondent. In view of the rule above stated that respondent is entitled to the most favorable view of this testimony and the reasonable inferences that may be drawn therefrom, we think that she made a sufficient prima facie showing of total dependency to support the commission's award thereof and we so hold. Whatever may have been true before February, 1933, the evidence tends to show that since that time, and at the time of his death, Sam Missey alone contributed to respondent's support and that she had no other property, means or income. Appellants' view apparently is that the evidence before the commission showed either total dependency or no dependency at all, because they say in their reply brief "there was no testimony before the commission to indicate or suggest to appellants . . . that claimant was only a partial dependent if a dependent at all." We think it is obvious that the most favorable view of this testimony, if believed, warrants a finding of total dependency. [See Schneider's Workmen's Compensation Law, secs. 367, 368, 370, 371, 372 and 373; Kiser on Workmen's Compensation Acts (40 Cyc.) 55-62, secs. 49-52; 28 R. C. L. 770-781, secs. 65-73; notes 13 A. L. R. 868; 30 A. L. R. 1253; 35 A. L. R. 1066; 39 A. L. R. 313; 53 A. L. R. 218; 62 A. L. R. 160; 86 A. L. R. 865; Rasor v. Marshall Hall Grain Co., 224 Mo. App. 253, 25 S. W. (2d) 506; Shaffer v. Williams Bros., Inc., 226 Mo. App. 635, 44 S. W. (2d) 185; Schmelzle v. Ste. Genevieve Lime & Quarry Co. (Mo. App.), 37 S. W. (2d) 482.]

After final award on hearing before the entire commission and appeal therefrom to the Circuit Court of Jackson County, appellants filed an application, in that court, to reverse and set aside the award of the commission on the ground that it was procured by fraud, and offered depositions in support thereof. These were objected to on the ground that it was not proper to hear evidence on any matter in the circuit court on appeal. The court reserved ruling on the admissibility of the depositions and took the whole matter under advisement. Thereafter, the court affirmed the award, making the following recitals in its judgment:

"This cause came on to be heard upon the transcript of the record and briefs submitted by both counsel for the plaintiff and defendants, and the court, after due consideration and the examination of the transcript of the proceedings from the Missouri Workmen's Compensation Commission, and *after examining the deposition offered in evidence by the defendants* and being fully advised in the premises *the court finds generally*:

"*For the claimant, appellee, Berenice Phillips, and against the defendants and appellants, Air Reduction Sales Company, a corporation, employer, and Globe Indemnity Company, a corporation, insurer.*

"The court further finds that the final award of the Missouri Workmen's Compensation Committee is fully supported by the evidence, and that that award should be affirmed."

There seems to be considerable doubt as to what it is proper to do upon appeal to the circuit court, under Section 3342, Revised Statutes 1929, on the ground "that the award was procured by fraud." Inasmuch as we consider that the record and judgment herein shows that the circuit court in this case did hear evidence and make a finding on that ground, we take this occasion to hold that the statute does authorize that. In DeMay v. Liberty Foundry Co., 327 Mo. 495, 37 S. W. (2d) 640, l. c. 654, this court pointed out that the Wisconsin courts had indicated that similar provisions of their act seemed to contemplate that evidence might be taken on this issue in the circuit court. Again, in State ex rel. May Department Stores v. Haid, 327 Mo. 567, l. c. 575, 38 S. W. (2d) 44, l. c. 48, this court commented, as follows:

"By the express language of the quoted section of the Compensation Act, the circuit court can 'review' only questions of law, and no new or additional evidence can be heard by the circuit court (except, possibly, where the issue is raised for the first time in the circuit court that the award of the Compensation Commission 'was procured by fraud,' which is one of the four grounds specified in Section 44 of the Compensation Act whereon the circuit court may set aside the award), and the findings of fact of the Compensation Commission, in the absence of fraud, are made conclusive and binding upon the circuit court; such findings of fact being analogous to the verdict of a jury."

Relying upon these references to the matter, and the statements made in Kiser' on Workmen's Compensation Acts (40 Cyc.) 122, section 126, the St. Louis Court of Appeals in Schmelzle v. Ste. Genevieve Lime & Quarry Co., 37 S. W. (2d) 482, l. c. 484, while fully recognizing the rule that as to the first three grounds for review stated in Section 3342, Revised Statutes 1929, there could be no evidence heard in the circuit court, said:

"As to fraud, however, the situation must obviously be quite different, for it would hardly be expected that matters fraudulent in their nature, and going to the procurement of the award, would be disclosed in the record of the cause certified by the commission to the circuit court. Consequently, if that particular ground of appellate review is to serve any very useful purpose in the administration of the law, the ruling must be (if the language of the act permits) that evidence may be taken on the issue of fraud in the circuit court.

"We have no doubt that this view of the matter is precisely what the Legislature intended. In other words, while the statute does generally provide that, upon appeal, no additional evidence shall

be heard, the context and purpose of the section as a whole fairly warrant the construction that the findings of fact made by the commission within its powers shall be conclusive and binding upon the circuit court, and that no additional evidence shall be heard upon the merits of the case, but yet, if fraud is charged in the procurement of the award, then evidence may be properly taken upon that issue.''

We approve this interpretation of the statute as correct. However, the right to try the issue ''that the award was procured by fraud'' does not mean that the losing party may, on claims of false testimony or misrepresentation of the facts by witnesses before the commission, produce further evidence on the issues tried before the commission and thus obtain another trial on any of such issues in the circuit court. The credibility of the witnesses and the determination of all material issues is for the commission and must be settled there. All such issues of fact are finally settled, when its final award is made and cannot be retried. [State ex rel. Sei v. Haid, 332 Mo. 1061, 61 S. W. (2d) 950.] We think that what is required to sustain the ground ''that the award was procured by fraud'' is the same kind of a showing that is required in a suit in equity to set aside a judgment on the ground that it was obtained by fraud, namely: That there was fraud which was practiced in the very act of obtaining the award; that there was fraud which operated, not upon matters pertaining to the judgment itself, but to the manner in which it was procured; that there was fraud which prevented the unsuccessful party from presenting his case or defense; or that there was fraud as to extrinsic, collateral, acts or matters, not examined and determined in the hearing before the commission. [15 R. C. L. 760-771, secs. 214-223; 34 C. J. 470-78, secs. 738-46; notes 88 A. L. R. 1201, 49 A. L. R. 1219; 16 A. L. R. 397; Bolden v. Sloss-Sheffield Steel & Iron Co. (Ala.), 110 So. 574, 49 A. L. R. 1206; Chicago, Rock Island & Pacific Railroad Co. v. Callicotte, 267 Fed. 799, 16 A. L. R. 386.] Matters which should have been brought before the commission to make a case or which should have been interposed there as a proper matter of defense cannot be relitigated because the parties neglected to do so or because they have found further evidence bearing on the truth or falsity of the testimony there. ''Courts of equity do not grant such relief for the purpose of giving the defeated party a second opportunity to be heard on the merits of the case.'' [Rogers v. Dent, 292 Mo. 576, 239 S. W. 1074; see, also, Wabash Ry. Co. v. Mirrielees, 182 Mo. 126, 81 S. W. 437; Hamilton v. McLean, 139 Mo. 678, 41 S. W. (2d) 224.] Neither does our Section 3342, and if an application does not allege facts sufficient to constitute fraud of the character above described, the trial court should overrule it without hearing evidence.

602

■ Appellants assign error here both on the ground that the court erred in failing to find and hold that the award was procured by fraud (stated generally and because of the specific reasons alleged as the grounds of fraud); and on the ground that "the court erred in failing or refusing to consider the application and evidence introduced and submitted by the appellants on the issue of fraud in the procurement of the award and in failing or refusing to make a finding on that issue." As to this latter ground, while we do not think that the court did fail to make a finding on that issue, it is sufficient to say that in appellants' motion for a new trial, preserved in the bill of exceptions showing the proceedings in the trial court on the issue of fraud, no such ground is stated and therefore no such matter is preserved for our review. [Sec. 1061, R. S. 1929; Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950; State ex rel. Rose v. Webb City, 333 Mo. 1127, 64 S. W. (2d) 597; Hablutzel v. Home Life Ins. Co. of New York, 332 Mo. 920, 59 S. W. (2d) 639; Crawford v. Amusement Syndicate Co. (Mo.), 37 S. W. (2d) 581; Dougherty v. Manhattan Rubber Mfg. Co., 325 Mo. 656, 29 S. W. (2d) 126; Syz v. Milk Wagon Drivers' Union, 323 Mo. 130, 18 S. W. (2d) 441.] We held in State ex rel. May Dept. Stores Co. v. Haid, 327 Mo. 567, l. c. 587, 38 S. W. (2d) 44, l. c. 54: "That neither a motion for new trial nor a bill of exceptions was necessary and essential in order to preserve for review . . . the proceedings and evidence had before the Workmen's Compensation Commission." However, that is not true of further proceedings in the circuit court on the issue "that the award was procured by fraud." These proceedings are, as we have held, in the nature of an equitable proceeding to set aside a judgment and there is no reason why the usual rules as to bills of exceptions and motions for new trial should not apply to them.

■ The motion for new trial does assign as error the failure of the court to hold that the award was procured by fraud. The charge of fraud was that "Berenice Phillips was not, prior to the date of Samuel Missey's death nor on the date of his death, totally dependent, or dependent at all upon the said Samuel Missey for support and maintenance, and well knew this to be a fact when she filed her claim for compensation," because she was "an able-bodied person having a gainful occupation and able to earn her own livelihood and support herself;" that "all payments of money by Samuel Missey to Berenice Phillips during and after the year 1931 were to the said Berenice Phillips as trustee for the use and benefit and to be used toward the partial support and maintenance of the mother of Samuel Missey and not for, or for the benefit, of the said Berenice Phillips;" and that respondent did, "upon learning that Frances Mueller, the mother of Samuel Missey, contemplated the filing of a claim before the

Missouri Workmen's Compensation Commission for compensation as the mother and partial dependent of the said Samuel Missey, and for the purpose of deceiving and defrauding employer and insurer, and for the purpose of deceiving the Commission, conspire and connive with, and persuade the said Frances Mueller not to file such a claim or any claim, and as a part of said scheme did agree with the Frances Mueller that she (Berenice Phillips) would file a claim for compensation as the total dependent of the said Samuel Missey and thus obtain a great deal more in compensation than could otherwise be obtained, and further agreed that she (Berenice Phillips) would turn over to, or divide with Frances Mueller any recovery had in said matter although both the said Berenice Phillips and Frances Mueller then well knew and since have well known that Berenice Phillips was not a total dependent of the said Samuel Missey at the time of his death and that Samuel Missey left no total dependent surviving him.'' Obviously, all of these matters, except the conspiracy, were matters which should have been presented to the commission as a defense.

Without further lengthening this opinion by setting out a full statement of the testimony of these witnesses, it may be conceded that the depositions of respondent's mother, brother and older sister tend, if believed, to show that there was a conspiracy between respondent and her mother as alleged. However, the court was not required to believe the testimony of the witnesses set forth in the depositions. Much of it merely created a conflict as to matters stated in respondent's evidence before the commission. The ill feeling of these witnesses toward respondent stands out in their testimony. But even their testimony shows that Sam Missey never sent any money from Kansas City to anyone except respondent, and although they claim that her mother received part of it, this came to her through Evelyn. The letters from Sam Missey, which are included in the depositions seem to contradict the testimony of these witnesses that he expected any of the money he sent to respondent, prior to February, 1933, when his stepfather's mind became affected, to go to his mother. While they do show that he thought his mother would thereafter need help, the matter seems to have been left to respondent's own judgment. If the court did not believe the material parts of the testimony of these witnesses as to a conspiracy, then it could properly find for respondent on the issue of fraud. We think that this is what the court did. Its recitals in the judgment above set out show that the court did consider the depositions on which appellants relied to prove fraud (they were the only depositions in the case) ; and that the court found generally (which must mean on all matters before it) for respondent and against appellants. It then followed this general finding with the specific finding

604

that the award was supported by the evidence and should be affirmed. If it did not intend to rule on the application to set aside for fraud, certainly there was no reason to make any other finding than this. We think that appellants have had their hearing on the issue "that the award was procured by fraud," and that the court has found against them. Even if we view the matter as we would an appeal in an equity case, we see no reason why we should not, after considering the testimony in the depositions, reach the same result as is stated in the judgment of the trial court.

The judgment is affirmed. *Ferguson* and *Bradley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.