**LUPTON**

v.

**GLENN'S OYSTER HOUSE, Inc. et al.**

No. 21902.

Kansas City Court of Appeals.

Missouri.

Jan. 11, 1954.

Spurgeon L. Smithson and John D. Steele, Kansas City, for appellants.

Lyman Field, Rogers, Field & Gentry, Kansas City, for respondent.

BROADDUS, Judge.

This is a workmen's compensation case. Claimant, Anna Lupton, filed her claim for injuries sustained on January 5, 1949, in an elevator shaft in the Scarritt Arcade Building in Kansas City, Missouri. It was admitted that claimant was an employee of Glenn's Oyster House, Inc., and was working under the provisions of the Missouri Workmen's Compensation Law, Section 287.010 RSMo 1949, V.A.M.S., but employer and insurer denied that the accident arose out of and in the course of the employment.

Trial before a referee resulted in a temporary award in favor of claimant. An application for review by the Industrial Commission was filed by the employer and insurer, and later a final award denying compensation was entered by the Commission. Claimant appealed to the Circuit Court where judgment was entered reversing the Industrial Commission and finding the accident compensable. Employer and insurer appealed to this court.

The facts are not in dispute. Claimant, Mrs. Lupton, was employed as a cook in the employer's restaurant located on the Walnut Street level of the Scarritt Arcade Building. Lillie Sunderland was then assistant manager of that restaurant. Marge Hicklin was a waitress. Mr. Glenn was president of the employer's corporation and Mrs. Glenn acted as manager of the Scarritt Arcade Restaurant.

In addition to occupying the restaurant premises on the Walnut Street level of the Scarritt Arcade Building the employer also rented a room on the third floor of the building. This room was used by female employees to change their clothes before and after work. It was also used to store food.

Mr. Glenn testified that after the Oyster House "closed to customers" at eight o'clock it then became claimant's "duty and responsibility" to secure the place, to put the food away, to clean up or assist in the cleaning of the various utensils "and then to go up and change her clothing on the third floor dressing room and bring the key back and hang it inside the premises before she left for the night." He stated that the employees were "not allowed" to keep their wraps or dresses down in the restaurant, as "there is a city ordinance against it;" that this was the reason why he rented the room on the third floor and "instructed" the employees to go there and change their clothes. He also testified that he stored foods in this third floor room and the employees were "instructed" to never leave the store-room-dressing-room unlocked and "to return the key and place it on a nail inside the premises down-stairs."

The pictures introduced in evidence by the employer and insurer disclose that the elevator involved is an ordinary passenger elevator with an open grill work comprising the top half of the elevator door. It is located a few feet from the stairway which also leads to the upper floors from

the Walnut Street level of the building. The elevator door could be opened by reaching one's hand through the open grill work in the top half of the panel and that would open the door regardless of whether the elevator was there or not. The testimony was that the building employee who ran the elevator went off duty at six o'clock.

Lillie Sunderland, the employer's assistant manager, was in charge of the restaurant on the night of claimant's accident. She testified that on that date, after the Oyster House closed for patrons at eight o'clock, it became claimant's duty to secure the place and then go to the room the employer maintained on the third floor to change her clothes. She observed claimant and the waitress, Marge Hicklin, going out the kitchen door "right around eight o'clock" and that they "were going to the dressing room to change their clothes." This was "within the time that the cooks and waitresses were supposed to be securing things in the restaurant and going up to change their clothes." Both women had their uniforms on as they went out the kitchen and Marge Hicklin "came rushing back within a few minutes after that." The employer and insurer objected to what Marge Hicklin said upon her return. Hence this was never disclosed, but whatever it was, the assistant manager in response thereto rushed to the elevator shaft with Marge Hicklin and there saw claimant, Mrs. Lupton, lying on her back at the bottom of the shaft with her uniform on. She observed that Mrs. Lupton had the storeroom key "clutched in her left hand, still holding the key."

At the time of the trial before the Referee, Marge Hicklin had left the employ of the employer and neither party knew her whereabouts and, thus, she did not testify.

Claimant testified that she had no recollection of falling down the elevator shaft. (Her doctors testified that this loss of memory is what is known as retrograde amnesia and was caused by the severe blow to her skull and the concussion when she fell into the shaft.) Claimant also testified that she did not know how to operate the elevator, but that she had ridden up on it with waitress Marge Hicklin "two or three times" after the operator had gone off duty. She said that Mrs. Glenn on one occasion had told her that she "could use the elevator" because "I was working so hard that I needed to ride up." This Mrs. Glenn denied.

Neither Mr. Glenn nor Mrs. Glenn were present at the time claimant was injured.

Claimant's testimony, and that of Mr. Glenn, Mrs. Glenn and of Lillie Sunderland was all to the effect that employees were not told anything "one way or the other" about the use of the elevator after the Scarritt Building operator had gone off duty at six o'clock. For example, Mrs. Glenn testified that she had never "given any instructions about whether or not the girls should operate or not operate the passenger elevator after the regular operator went off duty," because "that elevator didn't belong to us." And Lillie Sunderland testified that there "weren't any rules or standing orders of the Oyster House against the use of the elevator after hours." Nor were there any signs or warnings posted forbidding anyone to use the elevator after six o'clock.

The question here is—Did the accidental injury sustained by claimant arise out of and in the course of her employment? As said by this court in the case of Metting v. Lehr Construction Co., 225 Mo.App. 1152, 32 S.W.2d 121, 123: "Inquiry as to whether or not the accident arose out of and in the course of the employee's employment involves a law question." Certainly that would be true in the instant case where the facts stand undisputed.

The cases are in accord in holding that no rule can be stated drawing a line between injuries arising out of employment and those arising outside of it. Each case stands on its own facts. As said by our Supreme Court in Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S.W.2d 601, 605: "There is no justification for investing the words 'arising out of * * * his employment' with a technical meaning; they are plain, ordinary, and everyday

words, and should therefore be given their plain, usual, and ordinary meaning. Every case involving their application should be decided upon its own particular facts and circumstances and not by reference to some formula."

There are many cases holding that by his disobedience to unqualified instructions the employee has departed from the sphere or course of his employment and thereby rendered his injuries noncompensable. Among such cases are two upon which employer and insurer chiefly rely. Miliato v. Jack Rabbit Candy Co., Mo.App., 54 S.W. 2d 779, and Dulac v. Dumbarton Woolen Mills, 120 Me. 31, 112 A. 710, 712, both elevator cases.

In the Miliato case the court held that a finding by the commission that the employee was using the elevator for his own convenience in *violation* of the employer's known rules authorized an award denying compensation.

The Dulac case involved (1) A freight elevator, "not intended for personal use nor as a means of ingress or egress from the factory." (2) The use of this freight elevator was "forbidden" by the employer to the employees. (3) "He (employer) had notices posted against the use of it [freight elevator] by any employee." (4) The freight elevator was quite removed from the place where claimant worked and, therefore, she had no real occasion to use the "elevator for exit" as there was a good flight of stairs leading to the floor below nearby and "there were two regular exits from her room directly to the street, on the street level."

The instant case involved a passenger elevator which was located *right next* to the stairway to the upper floors. The use of this elevator was *not forbidden* by the employer, was not in violation of any company rule, and was not proved to have been unlawful.

It must be kept in mind that all of the testimony established that claimant went to the elevator with Marge Hicklin. Claimant testified that she did not know how to operate the elevator, but that Marge Hicklin "did take me up two or three times" before.

There was offered in evidence a City Ordinance which merely provided that: "Every elevator, except full automatic push button elevators, and except hand powered elevators and freight elevators not exceeding five stories lift nor at 100 per minute car speed, shall be in charge of a competent, reliable operator not less than 16 years of age, who shall have had at least one week experience in running an elevator under the supervision of a person who has received a certificate of competency as an elevator operator."

There was no showing made under the ordinance that Marge Hicklin was less than 16 years of age or that she had *not* had "at least one week experience in running an elevator under the supervision of a person who has received a certificate of competency as an elevator operator."

The holding in the case of Menendes v. Dravo Const. Co., 109 Pa.Super. 224, 167 A. 423, is persuasive here. In that case the claimant employee was injured in attempting to use a belt conveyor at which he was working, loading sacks of cement to be transported thereon from the lower to the upper deck of a barge, as a means of conveyance for himself—a sort of rude escalator—in going from the lower to the upper deck for a drink of water. The court said: "The circumstances of the case do not warrant a finding that he had abandoned his employment or was doing, at the time of the accident and its resultant injury, anything more than taking a negligent short cut upstairs for the purpose of getting a drink of water, intending to return to his work as soon as he had quenched his thirst." The court, in affirming an award in the employee's favor, distinguished cases where an employee had violated a positive company rule and said: "No violation of statute, or even of the orders of the employer, is involved in this case."

■■ Actually, on the facts in the instant case. claimant had been directed by her employer to go from the restaurant on

the ground floor to the third floor store room, to unlock it, to change her clothes and then to return the key to the restaurant before leaving. There was no instruction given as to how she was to get to the third floor—the route she was to follow or the manner or method. Nor was there any instruction that she was not to get upon the elevator except when it was being operated by the regular operator. She had ridden up on the elevator when it was operated by Marge Hicklin "two or three times" previously. Perhaps she was negligent in assuming that Marge Hicklin would again carry her safely to the third floor. But negligence is not a defense in this case. Scharlott v. New Empire Bottling Co., 354 Mo. 971, 192 S.W.2d 853.

Employer and insurer say there was "no causal connection shown between the conditions under which claimant's work was required to be done and the resulting injury."

This court in the case of Griffin v. Anderson Motor Service Co., 227 Mo.App. 855, 59 S.W.2d 805, 808, said: "We find no decisions in the courts of Missouri wherein our courts have undertaken to give to the word, 'causal,' a restricted meaning in the consideration of workmen's compensation cases." And our Supreme Court in the Leilich case, supra, said: "Why split hairs in trying to trace a 'causal connection' between his employment and his death."

In the Metting case, supra, where the employee left the employer's premises by the unique method of sliding down a rope used for transportation of materials, this court said: "In the case at bar we are of the opinion that the act of deceased in attempting to leave his work in the manner in which he did was not so wholly unconnected with and beyond his employment as would justify us in saying that it did not arise 'out of' and 'in the course of' his employment."

The above holding applies to the instant case. Undoubtedly it does, unless we cast aside the settled rule that "a doubt as to the right of compensation should be resolved in favor of the employee." Pruitt v. Harker, 328 Mo. 1200, 43 S.W.2d 769, 773.

The judgment of the Circuit Court should be, and is, affirmed.

All concur.